[No. S072949. Feb. 7, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
SPENCER RAWLINS BRASURE, Defendant and Appellant.

**Counsel**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and John Fresquez, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**WERDEGAR, J.**—Defendant Spencer Rawlins Brasure was convicted and sentenced to death for the 1996 kidnap and torture murder of Anthony Guest (Pen. Code, §§ 187, 190.2, subd. (a)(17), (18)) and was convicted of numerous other crimes as well. On automatic appeal, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Guilt Phase Evidence*

*Prosecution Evidence*

*The kidnapping, torture and murder of Anthony Guest*

In September 1996, defendant and his girlfriend Sonia Rodriguez were living with Billy Davis at a house in Hawthorne owned by Davis's father. Defendant, Davis, Rodriguez and another woman, Sandra Johnson, regularly used methamphetamine together and sold the drug to one another. In outline, the prosecution evidence showed that in early September, with Johnson's help, defendant and Davis kidnapped Guest, with whom they were all acquainted; that defendant and Davis then tortured Guest for some time at Davis's home; and that the two men (and perhaps another, Matt Ormsby) eventually took Guest to an isolated recreation area, where they put him under a bush, doused him with gasoline and set him alight.

Sandra Johnson pleaded guilty to conspiracy to kidnap and agreed to testify truthfully in proceedings involving Guest's death, in exchange for a grant of probation with a jail sentence not to exceed one year.

Johnson testified that in August 1996, she, Davis and defendant discussed their grievances against Guest. Johnson was annoyed because Guest, who had expressed unrequited romantic feelings for her, had been following her around and paging her often, and on one occasion had thrown an ice pick at her. He also acted paranoid and accused her of conspiring to get him hurt. Davis was angry at Guest for stealing items from Davis's house after staying with him and for hitting him on one occasion without provocation. Defendant was angry because some of the items Guest took were his. They agreed Guest should be beaten up, and defendant said he and Davis would do it if Johnson would bring Guest to them.

A few days later, Johnson discussed this proposal with Scott Crosby, who was angry at Guest for thefts and fights Guest was involved in while staying with him. Some time later still, when Crosby discovered where Guest was then staying, he and Johnson formulated a plan to pick up Guest (on the pretext they needed him to broker a drug deal) and deliver him to defendant. Defendant and Davis also having agreed, they executed the plan: Johnson and Crosby persuaded Guest to accompany them, and with Johnson driving and

Guest riding in the backseat of Johnson's two-door car they went to a fast-food restaurant parking lot a few miles from Davis's house. Johnson telephoned defendant, and he and Davis soon arrived in defendant's pickup truck. Defendant took Crosby's place in the front passenger seat of Johnson's car and, at gunpoint, ordered Guest, in the backseat, to turn around. Ignoring Guest's repeated plea, "Can't we just work this out?," defendant bound Guest's wrists with a plastic zip tie and directed Johnson to drive them to Davis's house.

Johnson left them at Davis's house, then drove to Crosby's and, eventually, to the home where she was staying. Later, she received a page from Sonia Rodriguez. When Johnson called her, Rodriguez asked Johnson to come and take her out of the house because "these guys were crazy." Johnson drove to Davis's house and honked the horn for Rodriguez, but then fell asleep. After about 45 minutes, Davis came out to her car and told Johnson to come in.

Following Davis into the house and down the hallway to the back room (referred to as the "red room" for its carpet color), Johnson twice heard a buzzing, crackling sound, followed by a moan or whimper. Guided into the red room by Davis, she smelled burning skin and saw Guest lying across a chair, his hands and feet tied together behind him and his mouth covered with duct tape. Defendant was standing in front of him, holding a wire or rod attached to a car battery, which was strapped to a large dolly.

Defendant touched the wire or rod to Guest's skin. Guest jerked and cried, and Johnson smelled his skin burn. Defendant told her to bend down and look Guest in the eye. She saw there was a bump on his forehead, his nose was bloody, and he looked scared and hurt. There were 10 to 12 red spots on his body where he had been burned with the rod. Defendant laughingly asked Johnson if Guest looked like a bitch. Afraid, Johnson answered that he did, then went into a smaller side room to see Rodriguez. Asked how long this had been going on, Rodriguez said a couple of hours. While talking to her, Johnson heard the buzzing sound several more times, followed by Guest moaning. She also heard the voices of defendant, Davis and Matt Ormsby.

From the small side room, Johnson heard defendant laugh and tell Davis and Ormsby to get trash bags and a trash can. She then heard the sound of bags being opened, thudding and a person whimpering. After she heard defendant's truck start up and drive away, she and Rodriguez emerged from

the small room. The red room was empty of people; the chair Guest had been lying on, as well as the dolly and battery, were also gone. Johnson took Rodriguez to a donut shop for about a half-hour, then dropped her back at Davis's house.

After these events, Johnson went to Davis's house less often. On one occasion, defendant told her he had put broken glass in Guest's mouth, duct-taped it shut and hit him in the face.

Nestor Largaespada testified he was drinking with Matt Ormsby outside a house near Davis's on the evening of September 7, 1996, when defendant shouted for Ormsby to come over to Davis's. Ormsby did so, and sometime later Largaespada followed him. Inside the back part of Davis's house, Ormsby led him to the red room. Largaespada saw a man wearing a Halloween mask seated with his hands crossed in front of him. Defendant, standing next to him, said something like: "This is what we do with white trash." Largaespada, afraid, left and told no one what he had seen.[1]

Joey March, Richard Lago, Ricardo Rivera and James Luna all testified to incriminatory statements defendant made after Guest's death.

March listened in on a telephone conversation between defendant and Davis, who was staying with March sometime after Guest's death. Defendant told Davis that if he went down for Guest's death, he would not go down alone. Davis responded in kind, and the two then reviewed what they had done together. Defendant said that after taking Guest from the fast-food restaurant parking lot at gunpoint, they took him to Davis's house and tied him up in the homemade "electric chair." He offered Guest a hit of methamphetamine, then shoved the glass pipe into Guest's mouth. Both he and Davis, defendant noted, burned Guest with a torch. They also used Krazy Glue to glue Guest's eyes shut. Later, defendant recounted, they took him in a van to a spot near Gorman, dumped him on the ground—causing his eyes to pop open and show his expression of pain—and doused him with gasoline. Defendant complained to Davis that because "none of you guys had a lighter," he had to use a flare from the van to set Guest alight. After providing this information to law enforcement officers, March received benefits in two of his own cases.

---

[1] Although Matt Ormsby had made a statement to the prosecution's investigator and given grand jury testimony corroborating Johnson's and Largaespada's testimony in many respects, and recounting incriminatory admissions by defendant, on the witness stand he recanted most of these statements, saying he had made them up or based them on things he had heard on the street or from the police.

Lago testified defendant told him he had made an electric chair, used it over the course of several days on a man, then taken the victim to "the desert" in Ventura County and set him on fire. Defendant was laughing and "getting kicks" out of this story as he told it. Rivera testified defendant told him he had used a car battery, transformer and jumper cables (which belonged to Rivera) to inflict pain on Guest ("the short dude with the Boston accent"), then taken the victim, whom defendant referred to as "white trash," to the desert. Luna testified defendant told him he had made an electric chair and had electrocuted and killed a man who had gotten out of line.

Guest's body was found on September 13, 1996, at a campground in the Hungry Valley State Vehicular Recreation Area (Hungry Valley SVRA) near Gorman in Ventura County. The body was underneath a partly burned juniper bush. Guest had third and fourth degree burns across his body. In some areas, including the face, his flesh was darkly charred and split from burning. His eyes were collapsed and decomposed, his nose flattened, and his mouth charred and mummified. (Guest's body was later identified by dental records and a distinctive tattoo.) The flesh of his legs had been eaten and gnawed by animals. The medical examiner was unable to assign a cause of death; though there was soot in Guest's airway, the presence of live maggots made it impossible to say the soot had entered by inhalation. From the size of the maggots on Guest's body, the medical examiner estimated Guest had been in the juniper bush for a week or two.

A magnesium plate, similar to those used by Davis's father in his printing business, was found against Guest's face.[2] An X-ray showed a staple in his head, and there was a small fragment of glass in his mouth. Found at the scene were a flare, a flare cap, pieces of melted zip ties and duct tape, staples, a large trash can and liner, and a partly burned folding chair. Blood matched to Guest's by DNA analysis was on the trash can liner, human tissue was on the zip ties, and blood that could not be tested was on the magnesium plate and trash can.

### Threatening witnesses and disobeying a court order

The prosecution presented evidence that while in jail on murder charges defendant wrote several letters to his friend Noreen Donaldson. In one,

---

[2] A Ventura County fire investigation specialist testified that magnesium, once ignited, burns at 5,400 degrees Fahrenheit and is very difficult to extinguish, but that a magnesium plate strapped to the head of a person and resting against the ground would be difficult to ignite with gasoline.

defendant asked Donaldson to give a copy of a "rat list" to another person, continuing, "Ricardo Rivera, James Luna, Joey March, Richard Lago, Scott Crosby are main rats that need to be killed ASAP before my next court date, July 16, 1997." In another, defendant said he hoped Donaldson was "helping me out with spreading the Joey March and Billy story and taking care of the rats." In a third, he instructed her to "type a letter to Lago stating that we (Hells Angeles) [*sic*] have located his son Steve. He'd better not testify in court on our family friend Spencer . . . . We are watching and there is no escape."

Donaldson testified she received several letters apparently signed by defendant asking that Billy Davis, Richard Lago, Sandra Johnson, James Luna and Joey March be killed. She showed some of them to defendant's brother, Chad Brasure. She also tried to hand-deliver a letter from defendant to Nestor Largaespada, but Largaespada refused to accept it, having (he testified) heard on the street that there was a rat list and believing he was on it. Richard Lago testified he received telephonic threats against his life and that of his son if he testified. A small explosive device was also thrown into his driveway by people directed by Chad Brasure. Sandra Johnson testified that when she appeared in the same courtroom as defendant, she heard him tell another person that she, Johnson, was a "rat" who was trying to get him convicted of murder.

In May 1997, a superior court judge, with defendant present in court, ordered that he not be allowed to send letters from jail except to his attorneys. In September and October 1997, defendant nonetheless sent letters to Billy Davis and another person.

### Theft and arson of a plumbing company van

Rangers at the Hungry Valley SVRA saw smoke and found a burning van on September 6, 1996, outside a campground (a different one than where Guest's body was later found). Automobile and plumbing parts were scattered around, and defendant's palm print was on the driver's side mirror.

James Luna testified that in September 1996, he had recently been terminated from a plumbing company job but still had keys to the van he had been using and to the company parking lot. He told defendant about a valuable new engine recently installed in the van, and the two formed a plan to steal the van and sell the engine. They took the van from the plumbing company premises, and defendant drove it to near Davis's house. Defendant told Luna he would take it to the desert and "chop" it up and would give Luna some of the profits. Two days later, however, defendant told Luna the engine had blown on the way to the desert, so he had burned the van to prevent its recognition.

Sonia Rodriguez testified that she, defendant and Davis took the plumbing van to a campground near Gorman in September. The men worked on the van for a long time but were unable to get the engine out, so they left it there and drove home in defendant's truck. The van caught fire as they were leaving.

*Defense Evidence*

Michael Rustali testified to statements Davis had made to him in jail about the torture of Guest, which implicated both defendant and Davis. According to Rustali, Davis said that he did most of the electric shocking, but he sometimes handed the shocking device off to defendant. Davis put a broken beer bottle in Guest's mouth. Davis and defendant then glued Guest's mouth and eyes shut. Both also used a stapler on Guest's ears. The torture session lasted about five hours.

Sonia Rodriguez testified that she saw Davis and Matt Ormsby in the red room with a man who was tied up and had rope or tape over his face. Though he looked like he wanted her help, she continued to the small side room. Later, she told defendant she wanted everyone to leave because she felt bad, had a headache and was hungry. She heard people moving around in the red room, then the sound of defendant's truck starting and driving away. About five minutes later, she saw defendant walk by her doorway. She then called Johnson, who came over and took her to a donut shop.

*Penalty Phase Evidence*

*Prosecution Evidence*

In 1996, defendant had several violent encounters with Michael Steele, who had argued with one of defendant's friends. On the first occasion, defendant swung a pool cue at Steele, injuring his finger and denting his automobile. In the second encounter, defendant shot at Steele but missed. The third time, defendant, carrying a crowbar, approached Steele while he was sitting in a parked car. Defendant told Steele to leave and broke the car's windshield with the bar. Finally, in October 1996, defendant shot at Steele and his friend Edward Saiz as they ran from defendant, seriously injuring Saiz.

In 1993, a dispute between defendant and a neighbor, Joseph Reuven, escalated into violence when defendant, according to Reuven, hit Reuven and threatened to kill him and his family. Reuven hit defendant back with a gardening trowel. Later, defendant threatened Reuven with a shotgun but did not fire it. In the following months, he left messages on Reuven's answering machine, calling him a dirty Jew and threatening to kill him and his family.

Nicole Brasure, defendant's adopted sister, who was five years younger than defendant, testified that several times when she was between seven and 10 years old defendant and she experimented sexually by taking off all their clothes and lying on top of one another. Defendant threatened to beat her up if she did not cooperate or if she told.

Guest's father testified to his shock and disbelief when he learned, from his ex-wife, of his son's death. He missed his son, particularly their telephone conversations, which Guest typically ended by saying, "I love you, Dad." Guest's mother testified that he was her favorite person in the world; they were best friends. Since learning of his death, she had been in therapy and taking antidepressants, and when she learned she was on a "rat list" kept by defendant, she became extremely afraid and did not leave her home for a year.

### Defense Evidence

Defendant's mother testified she was aware defendant had a tattoo saying, "Mama don't love me," but this was untrue. She had been the family disciplinarian and had started using a paddle on defendant when he was about six, mainly to discipline him for fighting. She also took him to counselors when he was in the fourth to sixth grades. Later, she began drinking regularly and taking tranquilizers. When she learned that defendant had been engaging in sexual activity with his sister Nicole, she took him to the police station and turned him in. When he was around 18, she helped his girlfriend get an abortion, though defendant wanted his girlfriend to have the baby. Defendant attempted suicide soon after that.

Defendant's father testified that he loved all his children, including defendant. Their mother had disciplined them by paddling and used "tough love" on defendant, but defendant's father did not participate in the discipline. He was aware that as a juvenile defendant fought with others and had problems with the police.

Defendant's sister Nicole testified that their mother was always drinking from a glass of wine and sometimes passed out on the couch; her drinking got progressively worse through their childhood. She beat all her children with a wooden paddle. According to Nicole, she, and later her brothers Chad and Scott, were her mother's favorites; there was some truth to defendant's tattooed statement that his mother did not love him.

A clinical psychologist who examined and evaluated defendant in 1985 diagnosed him as "a severely disturbed case of undersocialized aggressive conduct disorder." A psychiatrist who reviewed defendant's records and

examined him in 1998 diagnosed defendant as an archetypical case of antisocial personality disorder; he met all the diagnostic criteria: failure to conform to social norms of lawful behavior, deceitfulness for personal gain, impulsivity, aggressiveness as indicated by repeated assaults or fights, reckless disregard for his own or others' safety, irresponsibility, a lack of remorse and a tendency to rationalize his harmful behavior. His mother's rejection of him and her favoritism toward his siblings, her violent discipline and drinking, and his father's apparent pride in defendant's fighting ability had taught defendant that violence was a way to achieve one's aims and had predisposed him to antisocial personality disorder. Defendant also suffered from "polysubstance abuse."

*Procedural History*

Defendant was charged in count 1 with murdering Guest (Pen. Code, § 187),[3] with special circumstances of murder while engaged in kidnapping and intentional murder involving the infliction of torture (§ 190.2, subd. (a)(17), (18)); in count 2 with kidnapping Guest (§ 207, subd. (a)); in count 3 with torturing Guest (§ 206); in count 4 with arson of Guest's property on his person (§ 451, subd. (d)); in count 5 with conspiracy to commit grand theft automobile (§ 182, subd. (a)(1)); in count 6 with attempted grand theft of the plumbing van engine (§§ 487, subd. (a), 664); in count 7 with arson of the plumbing van (§ 451, subd. (d)); in count 8 with conspiracy to kidnap Guest (§ 182, subd. (a)(1)); in counts 9 through 13 with threatening Richard Lago, James Luna, Joey March, Richard (Ricardo) Rivera and Scott Crosby (§ 140); and in count 14 with disobeying a court order (§ 166, subd. (a)(4)), a misdemeanor.

The jury convicted on all counts except count 13, as to which it acquitted, and found the special circumstance allegations true. After the penalty phase trial, the jury returned a verdict of death. The trial court denied defendant's motion for new trial and his automatic motion for modification of penalty and sentenced him to death on count 1. Execution of sentence on counts 2, 3, 4 and 8 was stayed pursuant to section 654. On the remaining felony counts, the court sentenced defendant to an aggregate determinate prison term of two years eight months.

This appeal is automatic. (§ 1239, subd. (b).)

---

[3] All further unspecified statutory references are to the Penal Code.

DISCUSSION

### I. *Group Voir Dire on Attitudes Toward the Death Penalty*

Code of Civil Procedure section 223 provides in part: "Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." That provision, added by initiative (Prop. 115) in 1990, had the effect of abrogating this court's supervisory direction in *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*) that the death-qualifying voir dire always be conducted individually and in sequestration, i.e., out of the other prospective jurors' presence. (See *People v. Stitely* (2005) 35 Cal.4th 514, 536–537 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

Trial in this case was held in 1998. The trial court denied both parties' requests to conduct death qualification in sequestration, finding that Code of Civil Procedure section 223 applied and that collective voir dire was, in this case, practicable. The court recognized "that the discretion exists to conduct individual voir dire" but found no "special circumstances" to warrant it in this case. In the court's view, counsel had not established that individual voir dire was necessary for candid communication with the prospective jurors or that "the hoped-for gain" outweighed "the great consumption of time involved in individual questioning." The court expressly reserved the possibility of conducting individual questioning of particular venirepersons if needed.

Defendant contends the court's refusal to conduct sequestered voir dire of all prospective jurors denied him his rights under Code of Civil Procedure section 223, as well as his constitutional rights to due process, trial by an impartial jury and a reliable penalty determination (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16).

Citing our discussion in *Hovey*, defendant argues group voir dire deprived him of his constitutional rights because, as a general matter, it creates an unacceptable risk that jurors will be less forthright and revealing of their attitudes during voir dire, will be desensitized (by repeated discussion of a possible death sentence) to the onerousness of the penalty decision, or will be discouraged (by seeing prospective jurors who express opposition to the death penalty dismissed for cause) from employing their own doubts about the death penalty in deliberations. (See *Hovey, supra*, 28 Cal.3d at pp. 74–80.) But in *Hovey* we concluded only that these possibilities—and the People's lack of opposition to a requirement for individual voir dire—warranted using our supervisory authority to mandate individual, sequestered death qualification. (*Id.* at p. 80.) The *Hovey* rule was not constitutionally compelled; the electorate was free to abrogate it by initiative statute. (*People v. Stitely, supra*,

35 Cal.4th at p. 537; *People v. Cudjo* (1993) 6 Cal.4th 585, 628 [25 Cal.Rptr.2d 390, 863 P.2d 635].) Defendant provides no legal authority to support his claim that the *Hovey* procedure, because it *may* improve death qualification to some unknown extent, is constitutionally required in all cases.[4]

Turning to the trial court's decision in this case, defendant contends that, despite the express statement quoted above, the trial court did not actually exercise its discretion in denying the parties' requests to conduct death qualification in sequestration. We disagree. Unlike the trial court in *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1182–1184 [71 Cal.Rptr.2d 91], the court here clearly did not rely simply on the fact *Hovey* had been statutorily abrogated, but expressly considered whether the circumstances of this particular case made collective voir dire impracticable. That is the exercise of discretion Code of Civil Procedure section 223 calls for.

Nor do we agree the trial court abused its discretion in choosing collective voir dire with the possibility of questioning particular prospective jurors privately if needed. All prospective jurors filled out an extensive questionnaire that asked a series of questions probing the panelists' attitudes toward the death penalty. Each prospective juror was told to answer the questionnaire "by yourself, without help and/or assistance from any other person"; not to discuss its contents with anyone, including the other panelists; and to mark any answer that the prospective juror wanted to keep private with a "P," which would signal the court to ask about it outside the other jurors' presence.[5] Each prospective juror was then examined on his or her attitudes and ability to fairly judge the case, with counsel, rather than the court, conducting the bulk of the examinations. Counsel thus had full opportunity, through questioning, to discover a prospective juror's biases, if any, regarding the death penalty and its application. Defendant points to nothing in the facts of this case as they were known to the trial court at the time of its ruling, or in the composition of the venire, that made collective death qualification impracticable in this case. (See *People v. Box* (2000) 23 Cal.4th 1153, 1180–1181 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

---

[4] The single empirical study on which we relied in the pertinent portion of *Hovey* did not compare the effects of collective versus individual death qualification. Rather, it compared the responses of experimental subjects who were exposed to a videotaped session of voir dire that included a half-hour of death qualification to a control group of subjects who watched the same videotape with the death qualification portion deleted. (*Hovey, supra,* 28 Cal.3d at p. 76.) In adopting our supervisory rule, we acknowledged that individual voir dire might "entail the same dangers of inducing bias as do the current procedures" but believed it was worthwhile to adopt a procedure we thought would "minimize" the risk. (*Id.* at p. 81.) The voters disagreed with this policy balance in enacting Code of Civil Procedure section 223.

[5] At least one prospective juror was questioned privately, though the questioning did not focus on death penalty attitudes.

Defendant draws our attention to comments by some prospective jurors that, he asserts, might have improperly influenced the other panelists. For example, Juror No. 4, asked by defense counsel to explain a questionnaire answer that she voted for the death penalty law based on her "Christian beliefs," stated that "God teaches that if a man takes a life he should forfeit his own life."[6] But neither as to this juror nor as to any of the other instances defendant cites did defense counsel request that questioning on matters defendant now asserts were potentially prejudicial be conducted out of the other panelists' hearing. As the court had explicitly left open the possibility of such questioning in particular cases, any prejudice from the airing of attitudes that were apparent in the questionnaires cannot be attributed to the court's ruling.

The most vivid and potentially inflammatory comments defendant points to were those of Prospective Juror K., who, in answer to the question, "What, if anything, do you think the death penalty accomplishes?," wrote, "It kills the bastards." During voir dire, K. also recounted having sent a letter to then Texas Governor George W. Bush, expressing his approval of the governor's denial of clemency to Karla Faye Tucker; in the letter, K. said, he had written that Tucker "thought she could ride this born-again Christian thing out of death row." K. was extensively questioned by both counsel and the court, however, and at the conclusion of questioning was excused for cause in the presence of the other panelists. If the other jurors were at all influenced by this series of events, they presumably learned that extreme pro-death-penalty attitudes were subject to the court's disapproval. Following the reasoning defendant draws from *Hovey*, that lesson should have made them "less willing to express or rely on such attitudes in their consideration of penalty." (*Hovey*, *supra*, 28 Cal.3d at p. 74.)

Finally, defendant points to three other prospective jurors whose voir dire suggests they had been, in defendant's term, "educated" by prior voir dire that they should disavow statements (in answer to the questionnaire's question No. 64)[7] that they would always vote for the death penalty, whatever the evidence, if the defendant was convicted of first degree murder with a special circumstance. For example, Prospective Juror W. had checked "No matter what the evidence is, always vote for the death penalty" in answer to question

---

[6] Defendant does not mention that the juror immediately added that, in her view, the Bible also mandated that "a person has to be judged by witnesses," that the witnesses need to be "people that you can believe" and that there may be "mitigating circumstances" to a homicide.

[7] Question No. 64 on the jury questionnaire read as follows: "If the defendant is convicted of first degree murder and a special circumstance, would you: [¶] ___ No matter what the evidence is, always vote for the death penalty. [¶] ___ No matter what the evidence is, always vote for life without the possibility of parole. [¶] Which position are you more close to adopting, if either: [space provided for answer]."

No. 64, but explained in voir dire that he did not feel that way, that "[f]rom listening to the comments here in the last couple days, I guess I didn't answer that one very good or the question was obscure."

Defendant presumably means to imply not that the prospective jurors actually learned from others' voir dire what their duty would be should they serve as penalty phase jurors—a desirable form of education for a prospective juror—but rather that they learned to dissemble, to adhere falsely to a form of words they discerned would pass muster. But defendant cites, and we can find, nothing in the record to support this inference. For all that appears, Prospective Juror W. may originally have been confused by the questionnaire's phrasing, as he himself suggested,[8] or may genuinely have learned, by all the discussion he had heard, that under our statute a death sentence does not follow automatically from conviction of first degree murder with a special circumstance and that penalty jurors are required to weigh the evidence for each of the possible penalties.[9] Experience with *Hovey* voir dire has shown that it, too, can involve education of this nature. When first called to the capital venire, prospective jurors frequently know little about death penalty law and procedure and have reflected little on their own attitudes; their responses often change between the questionnaire and voir dire as well as during examination. Dishonesty, of course, is also possible under either system; voir dire, whether collective or sequestered, provides counsel the chance to ferret out hidden biases. Defense counsel had that opportunity here and availed himself of it, notwithstanding that questioning was in the presence of other jurors.[10] As in other recent cases, defendant has not shown on this record that " 'questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias.' " (*People v. Stitely, supra,* 35 Cal.4th at p. 539; see *People v. Navarette* (2003) 30 Cal.4th 458, 490 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

## II. *Introduction of Crime Scene and Autopsy Photographs*

Defendant contends the admission of several photographs of Guest's body, taken at the site where the body was found and during the subsequent autopsy, violated Evidence Code section 352 and deprived him of due process

---

[8] Defense counsel agreed with W. that the question might have been poorly phrased. Indeed, question No. 64's form may have confused prospective jurors by suggesting that they should adopt one position or the other, without the option of saying they would make the penalty decision on the basis of the evidence.

[9] The questionnaire had a preamble explaining this, but sometimes new concepts do not sink in the first time.

[10] Counsel passed Prospective Juror W. for cause but used a peremptory challenge against him.

of law by rendering his trial fundamentally unfair and the jury's sentencing decision unreliable.[11] We disagree.

The photographs were strongly probative to show the condition and circumstances of Guest's body when it was found (under a burned juniper bush, partly decomposed and eaten by animals, in a posture typical of severely burned bodies, with a magnesium plate resting against his head and chest) and the injuries Guest had suffered during his torture and burning (the severely charred flesh, the imprint of zip ties assertedly used to bind him and attach the plate, the collapse of his facial features, the pattern created on his skin by his burning clothes). As such, they were highly relevant to proof of how, when and where Guest was tortured and murdered and his personal property burned. The prosecution used the photographs for this purpose during the testimony of its witnesses.

■ Defendant argues these aspects of the prosecution case could have been proven by other means. But the prosecution is not required to seek stipulations or use "other 'sanitized' method[s] of presenting its case." (*People v. Carter* (2005) 36 Cal.4th 1114, 1170 [32 Cal.Rptr.3d 759, 117 P.3d 476]; see *People v. Box, supra,* 23 Cal.4th at p. 1199.) The photographs were not cumulative to the testimony of the police detectives and medical examiner; rather, they illustrated that testimony and made its import clearer to the jury. (*Carter,* at p. 1168; *Box,* at p. 1199.)

■ "As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim." (*People v. Osband* (1996) 13 Cal.4th 622, 675 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Here, the victim had been tortured at length, doused with gasoline and burned, and his body left exposed to the elements and wildlife for several days. Some of the photographs that documented this treatment were indeed gruesome, but not unnecessarily so. The challenged photographs simply showed what had been done to the victim; the revulsion they induce is attributable to the acts done, not to the photographs. In this capital trial for torture murder, the admission of graphic crime scene and autopsy photographs was not an abuse of discretion

---

[11] Defendant objected in limine to a number of crime scene and autopsy photographs designated by police or prosecution numbers that do not correspond to the exhibit numbers by which the photographs were referred to at trial and which they continue to bear in the appellate record. His objection, however, was renewed and clarified during the guilt phase trial: the objection, made on grounds of Evidence Code section 352 and due process, was to People's exhibit 4, a board displaying three photographs of the body at the scene where it was found, and People's exhibit 8, a board displaying eight autopsy photographs. He also objected (on the ground that "it's ugly") to People's exhibit 45, an X-ray image of the victim's skull showing a staple near his ear, but does not discuss that photograph in his briefing here.

under Evidence Code section 352 and did not render defendant's trial unfair or the jury's penalty decision unreliable.

### III. *Guilt Phase Instructions Regarding Accomplices' and Defendant's Role in Causing Death*

Defendant maintains the trial court erred, first, in instructing the jury pursuant to CALJIC No. 2.11.5 not to consider why others were not simultaneously on trial for the crimes against Guest and, second, by failing to instruct on causation of death pursuant to CALJIC Nos. 3.40, 3.41 and 8.55. The second error, he further argues, deprived him of due process and his right to a reliable penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution.

The court did not prejudicially err in instructing the jury with CALJIC No. 2.11.5.[12] The instruction was fully applicable to Billy Davis and Scott Crosby, accomplices in the kidnapping, torture and murder of Guest who did not testify at defendant's trial. With regard to the accomplices or possible accomplices who did appear as prosecution witnesses (Sandra Johnson and Matt Ormsby), defendant is correct the instruction should not have been given in unmodified form. (*People v. Jones* (2003) 30 Cal.4th 1084, 1113 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Cox* (1991) 53 Cal.3d 618, 667 [280 Cal.Rptr. 692, 809 P.2d 351].)

■ The jury, however, was also given a full set of instructions on witness credibility and assessing the testimony of accomplices, including the direction to consider the existence of any "bias, interest, or other motive" on a witness's part (CALJIC No. 2.20) and to view the testimony of an accomplice with caution (CALJIC No. 3.18). Where the jury has been so instructed, we have repeatedly held, giving CALJIC No. 2.11.5 is not prejudicial error. (*People v. Jones, supra*, 30 Cal.4th at pp. 1113–1114; *People v. Cain* (1995) 10 Cal.4th 1, 34–35 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Price* (1991) 1 Cal.4th 324, 445–446 [3 Cal.Rptr.2d 106, 821 P.2d 610].) As we explained in *Price*: "When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be

---

[12] As given in this case, CALJIC No. 2.11.5 read: "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crimes for which the defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial."

considered as evidence of interest or bias in assessing the credibility of prosecution witnesses." (*Price*, at p. 446.)

With regard to instruction on causation, defendant contends the court's failure to give CALJIC Nos. 3.40, 3.41 and 8.55[13] prevented the jury from determining whether his own acts caused the victim's death, if the jury believed the defense evidence (i.e., the testimony of Sonia Rodriguez) that he had stayed behind when the victim was taken to the Hungry Valley SVRA and burned. The Attorney General, in response, argues that causation was not an issue in this case: that Guest's death resulted from an unlawful act was not in question; the only question was whether defendant was responsible for that act, a question to which the now disputed instructions would not have spoken.

We agree with the Attorney General. This is not a case involving a possibly independent intervening act the defense contends superseded proximate causation by the proven criminal acts. (See *People v. Cervantes* (2001) 26 Cal.4th 860, 866–874 [111 Cal.Rptr.2d 148, 29 P.3d 225].) Rather, Guest undisputedly died as a direct result of defendant's and his accomplices' criminal acts; the question of defendant's responsibility was, at most, one of complicity, not causation.

The evidence was that Guest died from the severe physical abuse defendant and others inflicted on him at Davis's house, from his entire body being doused with gasoline and burned, or from a combination of these causes. The evidence further showed defendant fully participated in the torture session at Davis's house. Thus, to the extent Guest died of injuries inflicted in that session, no question of defendant's responsibility could arise. Nor could any such question arise if the jury found (as the prosecution evidence tended strongly to show) that defendant participated in taking the victim to the

---

[13] CALJIC No. 3.40 provides: "[To constitute the crime of _____ there must be in addition to the (result of the crime) an unlawful [act] [or] [omission] which was a cause of that (result of the crime ) .] [¶]The criminal law has its own particular way of defining cause. A cause of the (result of the crime) is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) and without which the (result of the crime) would not occur."

CALJIC No. 3.41 provides: "There may be more than one cause of the (result of the crime) . When the conduct of two or more persons contributes concurrently as a cause of the (result of the crime) , the conduct of each is a cause of the (result of the crime) if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the (result of the crime) and acted with another cause to produce the (result of the crime) . [¶][If you find that the defendant's conduct was a cause of (injury, death, etc.) to another person, then it is no defense that the conduct of some other person[, even the [injured] [deceased] person,] contributed to the (injury, death, etc.) .]"

CALJIC No. 8.55 provides: "To constitute [murder] [or] [manslaughter] there must be, in addition to the death of a human being, an unlawful act which was a cause of that death."

desert, tying a magnesium plate to his head, covering him with gasoline and setting him alight. Only if the jury believed Guest died of burning *and* credited Rodriguez's testimony that defendant stayed behind at the house could a question arise whether or not defendant was responsible for Guest's death. The complicity instructions given, however, fully equipped the jury to answer that question. The jury was instructed on the requisites of aiding and abetting liability (CALJIC No. 3.01) and was further told that defendant was liable for Guest's murder as an aider and abettor in kidnapping or torture only if the murder was committed by another principal in, and was a natural and probable consequence of, that target felony (CALJIC No. 3.02). The general instructions on causation defendant now argues should have been given would not have assisted the jury further in determining his criminal responsibility for Guest's murder.

## IV. *Felony-murder Instruction*

Defendant contends the court erred in instructing the jury on first degree felony-murder theories (murder in the commission of kidnapping and torture) when the indictment charged him only with murder with malice aforethought under section 187. Defendant contends the trial court lacked jurisdiction to try him for first degree felony murder and that by allowing the jury to convict him of an "uncharged crime" the court denied him his rights to due process, a jury trial, and a fair and reliable capital trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.) As in other recent cases, "[d]efendant's argument rests on the premise that under *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], felony murder and premeditated murder are separate crimes, and that *Dillon* implicitly overruled *People v. Witt* (1915) 170 Cal. 104 [148 P. 928], in which we held that a defendant may be convicted of felony murder even though the information charged only murder with malice." (*People v. Geier* (2007) 41 Cal.4th 555, 591 [61 Cal.Rptr.3d 580, 161 P.3d 104].)

As defendant acknowledges, these contentions have been considered and rejected in many prior cases. " '[W]e have long held that a pleading charging murder adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-murder theory.' [Citation.] Defendant mistakenly relies on *People v. Dillon*[, *supra*,] 34 Cal.3d 441 . . . , and in particular on a statement in the plurality opinion that the . . . felony murder and murder with express or implied malice, 'are not the "same" crimes.' [Citation.] As we have since explained, however, this means only that the elements of the two kinds of murder differ; there is but a single statutory offense of murder. [Citations.] 'Felony murder and premeditated murder are not distinct crimes . . . .' [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 367 [106 Cal.Rptr.2d 93, 21 P.3d 769]; accord, *People v. Geier, supra*, 41

Cal.4th at p. 591; *People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Moreover, even assuming an information simply charging murder may be insufficient in some situations to give notice of a first degree felony-murder theory (see *Silva*, at p. 368), here defendant was amply notified that the prosecution was proceeding on, inter alia, a felony-murder theory, as the indictment charged him with kidnapping and torturing Guest as well as murdering him and, on the murder count, contained special circumstance allegations of kidnap murder and torture murder. Defendant was not convicted of an uncharged crime and did not lack constitutionally required notice of the charges.

## V. *Standard Instructions on Jury's Consideration of Evidence*

Defendant contends the trial court denied him due process by giving several standard instructions on how the jury was to consider and weigh the evidence, which assertedly implied the prosecution bore a burden of proof lower than beyond a reasonable doubt.[14] We disagree that the instructions conveyed any such implication.

First, defendant argues that references to "reasonable" inferences in standard instructions on the use of circumstantial evidence (CALJIC Nos. 2.01, 2.02, 8.83, 8.83.1) diluted the proof-beyond-a-reasonable-doubt standard because "[a]n interpretation that appears to be reasonable . . . is not the same as an interpretation that has been proven to be true beyond a reasonable doubt." Examination of the full instructions shows defendant's concern to be groundless. Two of the instructions defendant complains of (CALJIC Nos. 2.01, 8.83) explicitly told the jury that every fact necessary to circumstantial proof of an offense or a special circumstance must be shown beyond a reasonable doubt. All the instructions complained of explicitly told the jury that if two possible inferences, both reasonable, could be drawn from the circumstantial evidence, the jury was required to reject the inference pointing to guilt or the presence of a required mental state and accept only the inference pointing to innocence or the lack of a required mental state. The instructions told the jurors they must accept a reasonable inference pointing to guilt *only* where any other inference that could be drawn from the evidence was *unreasonable*. That direction is entirely consistent with the rule of proof beyond a reasonable doubt, because an *unreasonable* inference pointing to innocence is, by definition, not grounds for a *reasonable* doubt. The circumstantial evidence instructions are thus correct. (*People v. Cleveland* (2004) 32 Cal.4th 704, 750–751 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713–714 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Hughes, supra*, 27 Cal.4th at pp. 346–347.)

---

[14] Defendant concedes the standard instruction defining proof beyond a reasonable doubt (CALJIC No. 2.90) is itself constitutional.

■ Additionally, defendant criticizes the references in various standard instructions to (1) the illegitimacy of an inference, from a defendant's arrest and trial, that he is "more likely to be guilty than not guilty" (CALJIC No. 1.00); (2) inferences from circumstantial evidence pointing to "guilt" or "innocence" (CALJIC No. 2.01); (3) the comparative "convincing force" of competing parts of the evidence (CALJIC No. 2.22); (4) the possible "probability of truth" in parts of the testimony of a witness who in other respects has given willfully false testimony (CALJIC No. 2.21.2); (5) "proof" of a "fact" without restriction to facts to be proven by the prosecution (CALJIC No. 2.27); and (6) a heat of passion or other condition "precluding" the deliberation of a killing (CALJIC No. 8.20). In light of the entire charge, however, none tends to suggest that defendant bears a burden of proving his innocence or that the prosecution's burden is less than one of proof beyond a reasonable doubt. Jurors are not reasonably likely to draw, from bits of language in instructions that focus on how particular types of evidence are to be assessed and weighed, a conclusion overriding the direction, often repeated in voir dire, instruction and argument, that they may convict only if they find the People have proven guilt beyond a reasonable doubt. (*People v. Nakahara, supra*, 30 Cal.4th at pp. 714–715; *People v. Maury* (2003) 30 Cal.4th 342, 428–429 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Turner* (1990) 50 Cal.3d 668, 697 [268 Cal.Rptr. 706, 789 P.2d 887].)[15]

## VI. Griffin *Error*

During his penalty phase argument to the jury, the prosecutor suggested that the jury had a responsibility to protect our freedoms and continued: "And one of the ways that we protect them is to hold people like Spencer Brasure accountable, because he does not accept responsibility. He will write letters off and say, 'Tell the Joey March story. Kill the witnesses that are against me' and now comes in and says, 'My mother made me what I am.' [¶] *When is he going to stand up and say, 'All right. I did it. That's me. I'm—I'm responsible for something.' Anything. He's never done that.*" (Italics added.) Defense counsel objected to the italicized remark as constituting a comment on defendant's failure to testify at his trial, in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. The trial court sustained the objection and, at defense request, immediately admonished the jury to disregard the comment.

A few minutes later, out of the presence of the jury, defense counsel moved for a mistrial and, in the alternative, asked that the jury be reinstructed not to

---

[15] Defendant also lists CALJIC Nos. 2.21.1 and 2.51 among those instructions diluting the reasonable doubt standard, but he makes no specific argument as to either. We see no such pernicious tendency in either instruction. (See *People v. Cleveland, supra*, 32 Cal.4th at p. 750 [approving CALJIC No. 2.51].)

draw any inference from defendant's failure to testify. The trial court denied the mistrial motion but instructed the jury as follows: "Before we resume with argument, let me say that there was during prior argument a reference that might be construed by the jurors as a comment on the lack of testimony in the trial from the defendant. Let me remind you of a couple of essential principles. [¶] A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way. In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence."

Defendant asserts that "these mild admonitions could not undo the harm caused by the prosecutor's improper comments," which he claims deprived him of his privilege against self-incrimination and his rights to due process and a reliable capital guilt and penalty determination. (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) The Attorney General maintains the trial court's immediate admonition to disregard the prosecutor's comment, coupled with its full instruction, shortly thereafter, not to discuss or consider defendant's failure to testify, cured any possible harm from the prosecutor's comment.

We agree with the Attorney General. The prosecutor's comment was brief and somewhat ambiguous. (The prosecutor's suggestion defendant should "stand up" and take responsibility for his actions did not necessarily refer to testifying, especially as the prosecutor had just referred to private letters defendant had written in which he sought to evade responsibility.) The court's direction not to consider the comment was immediate, unequivocal and repeated. Under these circumstances, and in light of the extremely aggravating circumstances of the crime and defendant's attempts to suppress evidence against him, any asserted *Griffin* error was harmless beyond a reasonable doubt. (*People v. Carter, supra,* 36 Cal.4th at p. 1267; *People v. Hardy* (1992) 2 Cal.4th 86, 154 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

VII. *Instruction on Weighing Aggravating and Mitigating Circumstances*

On its motion and over defendant's objection, the trial court substituted an instruction of its own formulation for CALJIC No. 8.88, a standard instruction directing the jury on how to deliberate on penalty. The court's instruction, among other differences, told the jury it "shall impose a sentence of death if the jury concludes that the aggravating circumstances outweigh the

mitigating circumstances."[16] It omitted the language of CALJIC No. 8.88 providing that to return a death verdict each juror "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."[17]

Defendant objected to the court's instruction on the ground that the language of CALJIC No. 8.88 was mandated by *People v. Brown* (1985) 40 Cal.3d 512, 541–544 [230 Cal.Rptr. 834, 726 P.2d 516] (*Brown*). The trial court acknowledged that our *Brown* decision directed this or similar language be used, but believed *Brown* rested on the assumption that instructing a jury it "shall impose" death if aggravating circumstances outweigh mitigating ones would restrict the jury's discretion in violation of the federal Constitution, an assumption that was shown incorrect by the United States Supreme Court's post-*Brown* decision in *Boyde v. California* (1990) 494 U.S. 370, 376–377

---

[16] The paragraphs of the court's instruction that differed from the standard instruction were as follows:

"Each juror must personally determine which of the two available penalties is appropriate in this case. Each juror must weigh the factors in mitigation against those in aggravation in determining the penalty. The weight to be assigned to any individual factor, and the weight to be assigned to the evidence which bears on each individual factor, is for each of you to decide.

"The jury shall impose a sentence of death if the jury concludes that the aggravating circumstances outweigh the mitigating circumstances. If the jury determines that the mitigating circumstances outweigh the aggravating circumstances the jury shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

"You must not make this determination by the simple process of counting the number of factors in aggravation or mitigation shown by the opposing sides. The analysis of the factors lies not in their relative numbers, but in their relative weight and convincing force. Any circumstance, either in mitigation or aggravation of penalty, standing alone, may be sufficient to support a decision as to the penalty to be imposed, provided that that circumstance outweighs the circumstances in opposition to it. Likewise, any combination of circumstances, either in mitigation or aggravation of the penalty to be imposed, may be sufficient to support a decision as to the penalty to be imposed, provided that that combination of circumstances outweighs the circumstances in opposition to them."

[17] The omitted paragraphs of CALJIC No. 8.88 were as follows:

"An aggravating factor is any fact, condition or event attending the commission of a crime which increases its severity or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

[108 L.Ed.2d 316, 110 S.Ct. 1190]. Viewing *Brown* as of doubtful authority after *Boyde v. California*, the trial court determined it would instruct in the "shall impose" language of the sentencing statute, section 190.3.

 The trial court should have followed our *Brown* decision, which had not then, and still has not, been overruled.[18] To the extent it believed *Brown* was decided on a constitutional point rather than interpreting section 190.3, the court misread our decision. In the pertinent portion of *Brown*, we held (1) that section 190.3's references to weighing of aggravating and mitigating circumstances is metaphorical, connoting "a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale' " (*Brown, supra*, 40 Cal.3d at p. 541) and (2) that the statutory "shall impose" direction "should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances" (*ibid.*). In a footnote expanding on the latter point, we observed that the balancing involved in capital sentencing is not between "good and bad but between life and death" (*id.* at p. 542, fn. 13)—to impose death, jurors must be persuaded not merely that the bad in the defendant's life and crimes outweighs the good, which will ordinarily be the case where the defendant has already been convicted of capital murder, but that "the 'bad' evidence is so substantial in comparison with the 'good' that it warrants death *instead of life without parole.*" (*Ibid.*) While we reached these holdings against a backdrop of constitutional principles as we understood them, the holdings were clearly interpretations of our death penalty statute and, as such, were authoritative. The federal high court's decision on constitutional issues in *Boyde v. California, supra*, 494 U.S. 370, did not affect *Brown*'s precedential status as an interpretation of state law.

As we have in several cases tried before *Brown*, however, we conclude that in this case, considering the totality of instructions and arguments, there is no reasonable likelihood the trial court's failure to instruct as directed in *Brown* misled the jurors as to the scope of their sentencing discretion or responsibility. (*People v. Carpenter* (1997) 15 Cal.4th 312, 419 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Proctor* (1992) 4 Cal.4th 499, 549 [15 Cal.Rptr.2d 340, 842 P.2d 1100]; see also *People v. Cooper* (1991) 53 Cal.3d 771, 845 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Boyde* (1988) 46 Cal.3d 212, 252–255 [250 Cal.Rptr. 83, 758 P.2d 25]; *People v. Melton* (1988) 44 Cal.3d 713, 761–762 [244 Cal.Rptr. 867, 750 P.2d 741]; *People v. Allen* (1986) 42 Cal.3d 1222, 1280 [232 Cal.Rptr. 849, 729 P.2d 115].)

---

[18] The judgment in *Brown*, reversing penalty because of an assertedly unconstitutional no-sympathy instruction, was reversed in *California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107·S.Ct. 837]. The high court's decision did not discuss the weighing issue.

The jurors here were expressly informed that the weight or "convincing force" they gave to any factor in mitigation or aggravation was for each of them to determine; that any factor or combination of factors could, if of sufficient force, outweigh any other; and that consequently the weighing they were to undertake was no "simple process of counting the number of factors in aggravation or mitigation shown by the opposing sides." Our concern in *Brown* that jurors be made to understand that weighing did not involve "mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them" (*Brown, supra,* 40 Cal.3d at p. 541) was clearly satisfied by these instructions. (See *People v. Carpenter, supra,* 15 Cal.4th at p. 419 [relying on similar instructions to find no risk the jury was misled]; *People v. Proctor, supra,* 4 Cal.4th at p. 547 [same]; *People v. Cooper, supra,* 53 Cal.3d at p. 845 [same].)

As to our second concern in *Brown*—that jurors understand they have discretion to vote for life in prison rather than death unless they conclude "death is the appropriate penalty under all the circumstances" (*Brown, supra,* 40 Cal.3d at p. 541)—the trial court's instruction was not as clear as CALJIC No. 8.88, which directs jurors to vote for death only if they find the aggravating circumstances "so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Yet the jurors *were* told to personally determine which penalty was "appropriate" and, as just discussed, were also told they were free to assign each factor, or the evidence supporting it, whatever weight or force they thought it should have. As we have said before, " ' "when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily understand that they have discretion to determine the appropriate penalty." ' " (*People v. Cooper, supra,* 53 Cal.3d at p. 845; see *People v. Hayes* (1990) 52 Cal.3d 577, 642 [276 Cal.Rptr. 874, 802 P.2d 376]; *People v. Boyde, supra,* 46 Cal.3d at p. 253.)

In addition, the penalty phase arguments of counsel repeatedly emphasized the scope and nature of the jury's sentencing discretion. The first prosecutor to argue began by telling the jurors that "now each of you will have to grapple with that very difficult decision to come to the appropriate sentence, an appropriate sentence that is based on the law and the facts." He continued by defining "appropriate" as "suitable for a particular person" or "fitting," and posed the question whether the punishment of death was "suitable for [defendant], given the facts and the law? Is it suitable for the crime that you have found to be true beyond a reasonable doubt? Is it fitting for him, given the facts and the law?" He then argued that based on the evidence the jury had heard "there is really only one appropriate sentence." In concluding, he asked rhetorically: "If you as representatives of our community cannot make the appropriate decision, then who can? And if this is not the appropriate case for death, then what case is?" While the prosecutor repeated the language of

the court's instruction, then, he also made clear the jurors had individual discretion to determine the appropriate penalty.

His fellow prosecutor, in the People's closing argument, also stressed that the penalty was not dictated by law but was the responsibility and choice of the jurors: "This defendant can get sentenced to life without the possibility of parole or he can get sentenced to death. And you as the triers of fact, as the decision makers of his punishment in this particular case, must make that decision, and you must make it based on the facts." "And you have to say to yourself: Does this case warrant the ultimate punishment that society imposes upon a person? The answer is yes based on the evidence." Answering a defense argument, he said: "To say that this is not a death penalty case may be the opinion of [defense counsel]. It is not the law. The law is you decide what the appropriate verdict is." He concluded by arguing the death penalty for defendant was "appropriate under the law because it is right and because it is just."

The defense attorneys similarly emphasized the jurors' discretion and responsibility, while of course urging they exercise that discretion in favor of a life sentence. The first defense attorney argued that while the facts of the crime were "aggravated," "it's not a death penalty case." Defendant is "not the worst of the worst, and this is not a death penalty case." "Understand that in California, in applying your guided discretion, you are guided by this law and you're guided by your common sense, and you're allowed to say to yourself: The integrity of human life is important. The defendant violated that. That doesn't mean that we will violate that. [¶] Send him to prison for life. Don't kill him. The killing must stop." The second attorney, in closing argument, reminded the jurors of their individual responsibility to decide penalty: "[I]t's your decision alone that counts. [¶] You can never shift the responsibility for the sentence in this case." He then stressed their discretion: "That's because the law as drafted is asking you, the jury, to be able to come back with life, if that's what you feel is right. . . . [¶] The death penalty [statute] in the state of California does not mandate that you find death. You don't have to. But if you feel that's the right verdict, that's what you have the right to do."

Considering the court's instructions that jurors were to personally determine the appropriate penalty and were free to weigh the circumstances in aggravation and mitigation as they each saw fit, and the arguments by all counsel stressing the responsibility the jurors bore for choosing the penalty and the discretion they possessed in deciding the question, we cannot find any reasonable likelihood that the court's instruction in the "shall impose" language of section 190.3 rather than the "so substantial" language of CALJIC No. 8.88, or the prosecutor's repetition of the instruction in argument, misled

the jurors as to their sentencing responsibility or discretion. (*People v. Melton, supra,* 44 Cal.3d at p. 762 [relying in part on the prosecutor's argument to show the jury was not misled as to its sentencing discretion]; *People v. Allen, supra,* 42 Cal.3d at pp. 1279–1280 [same]; cf. *People v. Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669] [prosecutor's argument left the jury with the impression it must impose death, whether or not each juror found that penalty appropriate, if aggravation outweighed mitigation].)

Turning to specific claims of defect in the trial court's instruction, defendant argues the court's use of the statute's "shall impose" language and omission of CALJIC No. 8.88's "so substantial" phrasing left the jurors in ignorance of their discretion to choose a life sentence even if they found no circumstances in mitigation. While CALJIC No. 8.88's phrasing more clearly conveys this principle than did the court's instruction (see *People v. Snow* (2003) 30 Cal.4th 43, 124 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Anderson* (2001) 25 Cal.4th 543, 600, fn. 20 [106 Cal.Rptr.2d 575, 22 P.3d 347]), we again do not believe it reasonably likely the jury was misled. Nothing in the prosecutor's argument suggested the jury should base its sentencing choice simply on an absence of mitigating factors. Indeed, the prosecutors twice acknowledged that defendant's lack of prior felony convictions was a factor in mitigation, albeit one the jury, they argued, should not weigh heavily. Together with the other instructions and argument described above, this argument adequately protected against the jury's mistakenly choosing death simply on the basis of a lack of mitigation, without finding that the aggravating circumstances themselves warranted the most severe penalty.

Defendant also argues that because the court omitted CALJIC No. 8.88's admonition that jurors were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider," jurors did not know to, and therefore did not, give the evidence moral or sympathetic value. The court's own instruction, however, told jurors that "[t]he weight to be assigned to any individual factor, and the weight to be assigned to the evidence which bears on each individual factor, is for each of you to decide." Moreover, the jury was instructed, via CALJIC No. 8.85, that under section 190.3, factor (k) they could consider in mitigation "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." Despite the omission of CALJIC No. 8.88's phrase "moral or sympathetic value" then, jurors were adequately informed that they could consider the mitigating evidence for whatever moral or sympathetic value they believed it should have.

■ Finally, defendant argues the court erred by omitting CALJIC No. 8.88's definitions of "aggravating" and "mitigating" factors. As we have previously held, however, such a definitional instruction is not required for these commonly understood terms. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1018 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Malone* (1988) 47 Cal.3d 1, 55 [252 Cal.Rptr. 525, 762 P.2d 1249].)

Because the trial court's choice of its own instruction over CALJIC No. 8.88 did not result in the jurors being misled as to their sentencing discretion and responsibility, we also reject defendant's claim the court's instruction denied him his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution.

## VIII. *Challenges to the Death Penalty Statute*

Defendant contends several aspects of California's capital sentencing statute, as interpreted by this court, violate provisions of the United States Constitution. As he acknowledges, we have previously considered and rejected these contentions.

As in *People v. Alfaro* (2007) 41 Cal.4th 1277 [63 Cal.Rptr.3d 433, 163 P.3d 118], defendant contends section 190.3, factor (a) is unconstitutional as applied because it is susceptible of arbitrary, "wanton and freakish" application. "We repeatedly have held that consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty. (*People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244] . . . .) As in *Brown,* defendant argues that a seemingly inconsistent range of circumstances can be collected from decisions upholding imposition of the death penalty. As we observed in *Brown,* however, '[w]hat this reflects is that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances.' (*Brown, supra,* at p. 401.) We also have rejected defendant's contention that the court must specify which factors under section 190.3 apply in aggravation and which in mitigation. (*People v. Osband*[*, supra,*] 13 Cal.4th [at p.] 694 . . . ; *People v. Espinoza* (1992) 3 Cal.4th 806, 827 [12 Cal.Rptr.2d 682, 838 P.2d 204].)" (*Alfaro,* at pp. 1330–1331.)[19]

---

[19] In connection with his contention that section 190.3, factor (a) results in arbitrary imposition of the death penalty, defendant asks this court to take judicial notice of portions of the trial records in numerous capital cases otherwise unrelated to this one. As explained above,

"Our statute 'is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt.' [Citation.] No instruction on burden of proof is required in a California penalty trial because the assessment of aggravating and mitigating circumstances required of penalty jurors is inherently ' "normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' " (*People v. Bell* (2007) 40 Cal.4th 582, 620 [54 Cal.Rptr.3d 453, 151 P.3d 292].) Nor is an instruction on the *absence* of a burden of proof constitutionally required. (*People v. Cornwell* (2005) 37 Cal.4th 50, 104 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

Defendant cites *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] as requiring that certain sentencing findings be made by a jury. These decisions are inapposite for reasons previously explained: " '[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*' [(*People v. Anderson, supra,* 25 Cal.4th at pp. 589–590, fn. 14.)] The high court's recent decision in *Ring v. Arizona*[, *supra,*] 536 U.S. 584 . . . does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 . . . .) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system

that the aggravating character of particular facts may vary from case to case with the factual context does not indicate a constitutional flaw in the use of factor (a). For this reason, trial records showing that prosecutors have made such varied use of facts to argue for aggravating circumstances are irrelevant to the merits of defendant's constitutional argument. On this ground, we decline to take the requested judicial notice. (See *People v. Young* (2005) 34 Cal.4th 1149, 1171 [24 Cal.Rptr.3d 112, 105 P.3d 487] [declining notice of irrelevant records from other cases].)

constitutionally must find any aggravating factor true beyond a reasonable doubt." (*People v. Snow, supra*, 30 Cal.4th at p. 126, fn. 32; accord, *People v. Demetrulias* (2006) 39 Cal.4th 1, 41 [45 Cal.Rptr.3d 407, 137 P.3d 229].)[20]

"[W]e also disagree with defendant that our statute is unconstitutional because it does not require jurors to agree unanimously on the existence of particular factors in aggravation. [Citations.] While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess such potentially aggravating factors as the circumstances of the capital crime (§ 190.3, factor (a)), prior felony convictions (*id.*, factor (c)), and other violent criminal activity (*id.*, factor (b)), and decide for him- or herself 'what weight that activity should be given in deciding the penalty.' [Citation.] The series of normative judgments involved in deciding whether a particular circumstance is indeed aggravating and, if so, what weight it should be given, cannot be fitted into a scheme of unanimous jury factfinding." (*People v. Demetrulias, supra*, 39 Cal.4th at p. 41.)

" 'Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required.' (*People v. Snow, supra*, 30 Cal.4th at p. 126; accord, e.g., *People v. Gray* [(2005)] 37 Cal.4th [168,] 237 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Stitely, supra*, 35 Cal.4th at p. 574.)" (*People v. Bell, supra*, 40 Cal.4th at p. 621.)

The Constitution does not forbid use of unadjudicated prior criminal activity as a circumstance in aggravation or require jury unanimity as to proof of such prior activity. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1181–1182 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Stanley* (2006) 39 Cal.4th 913, 962 [47 Cal.Rptr.3d 420, 140 P.3d 736].)

"Use in the sentencing factors of such adjectives as 'extreme' ([§ 190.3,] factors (d), (g)) and 'substantial' (factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution. (*People v. Lewis* [(2001)] 26 Cal.4th [334,] 395 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Anderson, supra*, 25 Cal.4th at p. 601.)" (*People v. Morrison* (2004) 34 Cal.4th 698, 729–730 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

The trial court was not obliged to instruct the jury that defendant bore no burden of proving mitigating circumstances beyond a reasonable doubt or that

---

[20] *Blakely v. Washington* does not add support to defendant's claims. *Blakely* involved a trial court's imposition of an " 'exceptional' " sentence, one outside the " 'standard range' " statutorily set for the offense of which Blakely was convicted. (*Blakely v. Washington, supra*, 542 U.S. at p. 299.) But, defendant's jury having unanimously and beyond a reasonable doubt found him guilty of first degree murder with special circumstances, death was one of the two possible penalties set by statute, not an exceptional sentence outside the standard range.

mitigating circumstances did not have to be found unanimously. (*People v. Zambrano, supra*, 41 Cal.4th at p. 1186; *People v. Roldan* (2005) 35 Cal.4th 646, 741 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

Because capital and noncapital defendants are not similarly situated in the pertinent respects, equal protection principles do not mandate that capital sentencing and sentence-review procedures parallel those used in noncapital sentencing. (*People v. Morrison, supra*, 34 Cal.4th at p. 731; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

"Instructions on the meaning of a sentence of life imprisonment without the possibility of parole and on the 'presumption of life' were not constitutionally required. (*People v. Gray, supra*, 37 Cal.4th at p. 237; *People v. Stitely, supra*, 35 Cal.4th at p. 573; *People v. Snow, supra*, 30 Cal.4th at pp. 123–124; *People v. Arias* (1996) 13 Cal.4th 92, 172–173 [51 Cal.Rptr.2d 770, 913 P.2d 980].)" (*People v. Demetrulias, supra*, 39 Cal.4th at p. 43.)

### IX. *Instruction on Mitigating Circumstances*

Defendant raises three challenges to CALJIC No. 8.85, a standard instruction on mitigating factors. As he acknowledges, we have previously considered and rejected these contentions. "Contrary to defendant's assertions, the trial court had no obligation to advise the jury which statutory factors are relevant solely as mitigating circumstances and which are relevant solely as aggravating circumstances. [Citations.] Moreover, it was proper for the court to instruct the jury in the language of CALJIC No. 8.85 without deleting certain factors that were inapplicable to defendant's case." (*People v. Farnam* (2002) 28 Cal.4th 107, 191–192 [121 Cal.Rptr.2d 106, 47 P.3d 988].) And, as stated in regard to the previous claim, "Use in the sentencing factors of such adjectives as 'extreme' ([§ 190.3,] factors (d), (g)) and 'substantial' (factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution." (*People v. Morrison, supra*, 34 Cal.4th at pp. 729–730.)

### X. *Refusal of Special Instructions on Mitigating Circumstances*

Defendant contends the trial court erred by refusing to give the jury two special instructions he proposed, both intended to supplement CALJIC No. 8.85's directions on mitigating circumstances. We find no error. Both proposed instructions were argumentative in directing that "[a] juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence is." without a similar direction as to aggravating evidence. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1225 [135 Cal.Rptr.2d 553, 70 P.3d 981].) To the extent the proposed instructions

told the jurors they were free to consider "mercy, sympathy and/or sentiment" (special instruction No. 1) or "compassion or sympathy" (special instruction No. 2), they were essentially duplicative of CALJIC No. 8.85, which told jurors that under section 190.3, factor (k) they could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death" and that they were to disregard any contrary guilt phase instruction. To the extent defendant's special instruction No. 1 specified that "[a]ny mitigating circumstance may outweigh all the aggravating factors" and justify a life sentence instead of the death penalty, it was duplicative of the court's special instruction on the weighing of aggravating and mitigating circumstances. (See pt. VII., *ante*.) Finally, the trial court was not obliged to instruct, as in both of defendant's special instructions, that defendant bore no burden of proving mitigating circumstances beyond a reasonable doubt. (*People v. Zambrano, supra*, 41 Cal.4th at p. 1186; *People v. Roldan, supra*, 35 Cal.4th at p. 741.)

### XI. *Juror Misconduct*

Defendant contends a juror's misconduct in looking up dictionary definitions of "aggravate" and "mitigate" deprived him of his rights to due process, an impartial jury and a reliable penalty proceeding. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) The trial court, he argues, should have granted his new trial motion on this ground. We conclude the juror committed misconduct, but the resulting presumption of prejudice is rebutted because the outside information was inherently nonprejudicial.

After trial, Juror No. 11 stated in a declaration that the night before penalty deliberations began she consulted a dictionary for the definitions of "aggravate" and "mitigate." The dictionary she consulted defined "aggravate" (first meaning given) as "[t]o make worse; intensify, as an illness" and "mitigate" (only meaning given) as "[t]o make or become milder or less severe." The juror also stated she did not "think" she told anyone she had looked up these terms. The jury foreperson declared she did not recall the definitions, or any reference to a dictionary, being discussed during deliberations. After hearing argument but without an evidentiary hearing, the trial court denied defendant's new trial motion, finding that while Juror No. 11 had committed misconduct, "I can't fathom how it would have affected the outcome of this case. It appears to me it would not have done that."

The Attorney General implicitly concedes, and we agree, that the juror misconducted herself by disobeying the court's repeated direction not to do outside research. (*People v. Karis* (1988) 46 Cal.3d 612, 642 [250 Cal.Rptr. 659, 758 P.2d 1189].) In these circumstances, however, the resulting presumption of prejudice is fully rebutted. (See *id.* at pp. 644–645 [no prejudice

from similar definition of "mitigate"].) As discussed earlier in this opinion, our capital sentencing scheme uses "aggravate" and "mitigate" in their ordinary sense, not with a special legal meaning on which jurors must be instructed. (*People v. Kirkpatrick, supra*, 7 Cal.4th at p. 1018.) The danger that a juror using a dictionary will "misunderstand the meaning of terms which have a technical or unique usage in the law" (*Karis*, at p. 642) is therefore not present here. An aggravating circumstance *is* one that makes the offense or offender "worse"; a mitigating circumstance *is* one that makes the offense or offender "milder or less severe."

Defendant argues that the dictionary definition of "mitigating" could have led Juror No. 11 and any other jurors with whom she shared it to incorrectly reject some of defendant's proffered penalty phase evidence because it "does not logically make [defendant's] crimes or conduct 'milder or less severe.' "[21] But the definition could logically be applied to the faults in defendant's character and record as well as to his offenses. As we observed in *Karis*: "Nothing in the definition suggests the restricted meaning that defendant believes the jury may have attributed to the word mitigating." (*People v. Karis, supra*, 46 Cal.3d at p. 645.) In any event, here the jury was also instructed that under section 190.3, factor (k) they could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." Certainly nothing in the dictionary definition would logically have led a juror to disregard this instruction. We find no reasonable probability of harm to defendant from Juror No. 11's misconduct. (*Karis*, at p. 642; see *People v. Williams* (2006) 40 Cal.4th 287, 309 [52 Cal.Rptr.3d 268, 148 P.3d 47].)[22]

## XII. *"International Norms" and the Eighth Amendment*

Defendant points out that all Western European countries, and many others around the world, have either abolished the death penalty or restrict its use to extraordinary crimes. He contends that this near-consensus demonstrates evolving standards of decency and humanity that should be deemed to bar

---

[21] Defendant also asserts that the trial court incorrectly relied on the juror declarations to find that Juror No. 11 did not convey the definitions to the rest of the jury and that the court should instead have conducted an evidentiary hearing into that question. To the contrary, the court relied on the inherently nonprejudicial nature of the information, explaining that "the dictionary definition is as good as any other definition that could have been employed by the jurors." Under this view, prejudice was rebutted even if the definition was conveyed to other jurors; an evidentiary hearing on that point was unnecessary.

[22] Defendant argues that because the misconduct denied defendant his federal constitutional rights we should apply a "beyond a reasonable doubt" or "reasonable possibility" standard of prejudice. Without necessarily agreeing the misconduct here did violate any of defendant's constitutional rights, we hold any prejudice rebutted to the extent required by those more stringent tests as well.

use of execution "as a regular form of punishment" under the Eighth Amendment to the United States Constitution. As we recently said, however, "[d]efendant's argument that the use of capital punishment 'as *regular punishment* for substantial numbers of crimes' violates international norms of human decency and hence the Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)" (*People v. Demetrulias, supra,* 39 Cal.4th at pp. 43–44; accord, *People v. Bell, supra,* 40 Cal.4th at p. 621.)

Moreover, although "defendant would have us consider that the nations of Western Europe no longer have capital punishment, those nations largely had already abolished it officially or in practice by the time the United States Supreme Court, in the mid-1970's, upheld capital punishment against an Eighth Amendment challenge. (See generally *The Death Penalty, Abolition in Europe* (Council of Europe 1999) p. 10.) We find no reason to question the United States Supreme Court's conclusion that capital punishment, per se, is not cruel and unusual punishment in contravention of the Eighth Amendment to the United States Constitution." (*People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

### XIII. *Violation of International Law*

"Defendant further contends the statute violates the International Covenant on Civil and Political Rights (ICCPR). Even assuming defendant has standing to invoke the ICCPR [citations], we have recently rejected defendant's contentions and decline to reconsider our decision to do so (see [*People v.*] *Brown, supra,* 33 Cal.4th at pp. 403–404)." (*People v. Turner* (2004) 34 Cal.4th 406, 439–440 [20 Cal.Rptr.3d 182, 99 P.3d 505].)

### XIV. *Direction to Disregard Guilt Phase Instructions*

In its opening instructions for penalty phase deliberations, the trial court directed the jury to "[d]isregard all other instructions given to you in other phases of this trial." While the court then gave several instructions specifically discussing the jury's consideration of aggravating and mitigating evidence (CALJIC Nos. 8.85, 8.87, and special instructions on lingering doubt and on weighing aggravation and mitigation), the court did not reinstruct the jury on any of the general guidelines for assessing testimony contained in standard guilt phase instructions. Defendant contends this combination of

directions left the jury without guidance for evaluating the trial evidence, thereby depriving him of the fair and reliable capital sentencing determination guaranteed by the Eighth Amendment to the United States Constitution.

We addressed the same claim, on virtually identical procedural facts, in *People v. Carter, supra,* 30 Cal.4th at pages 1218–1222. We noted that omission of certain instructions routinely given at the guilt phase might actually benefit a capital defendant in the penalty phase because the effect could be, for example, to "cabin less strictly the jury's consideration of mitigating evidence" or to "avoid an unfavorable focus on the aggravating evidence." (*Id.* at p. 1220.) Rather than assume prejudice or speculate as to the effect of the court's direction, we required the defendant to "demonstrate that the omission of the evidentiary instructions here resulted in prejudice." (*Ibid.*) We found no such demonstration had been made in that case, but cautioned future trial courts not to dispense with evidentiary instructions at the penalty phase. (*Id.* at p. 1222.)

Defendant claims the direction to disregard guilt phase instructions prejudiced him in three respects. First, he asserts the trial court thereby "encouraged" Juror No. 11 to consult a dictionary for the definitions of "aggravate" and "mitigate." But even assuming Juror No. 11 thought she was to disregard earlier admonitions against seeking outside information (she did not so declare), no prejudice resulted from her doing so, as we have already explained. (See pt. XI., *ante.*)

Second, defendant claims the court's direction left the jury free to consider, in penalty phase deliberations, his failure to testify. But in fact the jury was specifically instructed, during the penalty phase argument, not to consider, and to draw no inferences from, defendant's failure to testify. (See pt. VI., *ante.*)

Finally, defendant claims that because the jury was told to disregard the standard instruction, given at the guilt phase, on distrust of a witness who was willfully false in one part of his or her testimony (CALJIC No. 2.21.2), the jury was free to accept, at the penalty phase, all the testimony of any prosecution witness despite impeachment.[23] But the instruction that a juror might choose to disbelieve a witness "who willfully has testified falsely as to a material point" embodies a commonly held precept of judging credibility; we will not assume that jurors acted contrary to common sense simply on the basis of a general direction to disregard the guilt phase instructions. (And if

---

[23] Ironically, in claim V of his brief, defendant contends this instruction, among others, unconstitutionally diluted the prosecution's burden of proof at the guilt phase. He thus appears to argue inconsistently that the instruction was unconstitutional but should have been repeated at the penalty phase.

they did, of course, they might therefore have given more credence to impeached *defense* witnesses, such as Sonia Rodriguez.)

As in *People v. Carter, supra*, 30 Cal.4th at pages 1221–1222, therefore, we conclude the trial court's failure to reinstruct and its direction to disregard guilt phase instructions was harmless even under the beyond-a-reasonable-doubt prejudice standard for federal constitutional error.

## XV. *Cumulative Prejudice Affecting Penalty Verdict*

Defendant contends "the trial court's erroneous rulings" had a "synergistic negative effect" that cumulatively undermined the reliability of the penalty verdict, depriving him of his rights under California law and the Eighth and Fourteenth Amendments to the United States Constitution. We have identified only three erroneous or assumedly erroneous rulings by the trial court: giving an unmodified guilt phase instruction (CALJIC No. 2.11.5) on nonprosecution of coparticipants (see pt. III., *ante*); giving a special penalty phase instruction on the weighing of aggravating and mitigating circumstances instead of an instruction in the language of CALJIC No. 8.88 (pt. VII., *ante*); and directing the jury at the penalty phase to disregard the guilt phase instructions while failing to reinstruct on general evidentiary guidelines applicable in the penalty phase (pt. XIV., *ante*). We have concluded no prejudice arose from any of these possible errors, and we can discern no cumulative or synergistic effect arising from them.

## XVI. *Victim Restitution Order and Parole Revocation Restitution Fine*

Anthony Guest's mother, Lee Anderson, told the probation officer she had incurred $2,500 in expenses while attending the trial and had lost approximately $100,000 in wages because she "has been unable to work for the past two years" due to the trauma of her son's murder. The probation officer recommended defendant be ordered to pay Anderson restitution of $102,500. Without objection, the court so ordered.

Defendant contends the direct restitution order was not authorized by section 1202.4, subdivision (f) because Anderson's loss of income resulted from a psychological injury rather than a physical one.[24] But the sentencing court's statutory authority was not so limited. Section 1202.4, subdivision (f) provides for a direct restitution order "in every case in which a victim has suffered economic loss as a result of the defendant's conduct." The order is to be for an amount "sufficient to fully reimburse the victim or victims for every

---

[24] Defendant concedes that as an immediate family member of the murder victim, Anderson was a "victim" within the meaning of the statute. (See § 1202.4, subd. (k)(1).)

determined economic loss incurred as the result of the defendant's criminal conduct." (*Id.*, subd. (f)(3).) The statute does not distinguish between economic losses caused by physical injuries and those caused by psychological trauma.

Defendant also argues the restitution order was "inappropriate" because of evidence (not introduced at trial) that Anderson had sought a restraining order against her son and because Anderson's economic loss was not shown by documentation or sworn testimony. But by his failure to object, defendant forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute. (*People v. Smith* (2001) 24 Cal.4th 849, 852 [102 Cal.Rptr.2d 731, 14 P.3d 942].) As the order for restitution was within the sentencing court's statutory authority, and defendant neither raised an objection to the amount of the order nor requested a hearing to determine it (see § 1202.4, subd. (f)(1)), we do not decide whether the court abused its discretion in determining the amount.

Finally, defendant contends the $10,000 parole revocation fine imposed but suspended under section 1202.45 was unauthorized. We disagree. Defendant here, in addition to his death sentence, was sentenced (for counts 5, 6, 7, 9, 10, 11 & 12) to a determinate prison term under section 1170. Section 3000, subdivision (a)(1) provides that such a term "shall include a period of parole." Section 1202.45, in turn, requires assessment of a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole." The fine was therefore required, though by statute and the court's order it was suspended unless and until defendant was released on parole and his parole was revoked. (*Ibid.*)

*People v. Oganesyan* (1999) 70 Cal.App.4th 1178 [83 Cal.Rptr.2d 157], upon which defendant relies, is distinguishable as involving no determinate term of imprisonment imposed under section 1170, but rather a sentence of life without the possibility of parole for first degree special circumstance murder and an indeterminate life sentence for second degree murder. (*Oganesyan*, at p. 1181.) As in *Oganesyan*, to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence. Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine. Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked.

## Conclusion

We find no prejudicial error affecting defendant's conviction or death sentence. The judgment of the trial court is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied March 26, 2008.