Filed 6/25/21  P. v. Martinez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E070464 |
| v. | (Super. Ct. No. RIF1210549) |
| ERNESTO SALGADO MARTINEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.  Affirmed.

Diane Nichols under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

An Arizona jury convicted defendant and appellant Ernesto Salgado Martinez of murdering Arizona Department of Public Safety Trooper Robert Martin. The Arizona trial court sentenced defendant to death, and the Arizona Supreme Court affirmed. Martinez was later charged with first degree murder (Pen. Code, § 187)[1] in California for killing a minimart employee, Randip Singh, in Blythe, California, on the same day he murdered Martin. While awaiting trial for Singh's murder, defendant repeatedly stabbed his cellmate, Leroy Gutierrez, and was charged with attempted murder (§§ 187, 664) and the lesser included offense of attempted voluntary manslaughter (§§ 192, 664).

Defendant was tried jointly for Singh's murder and the attempted murder of Gutierrez. The jury convicted defendant of murdering Singh. The jury also found true robbery, burglary, and prior-murder special circumstance allegations (§§ 190.2, subds. (a)(2), (a)(17)(i), (a)(17)(vii)) and a personal firearm use allegation (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)). The jury acquitted defendant of attempting to murder Gutierrez and hung on the attempted voluntary manslaughter charge.

On appeal, defendant raises eight claims of error. We find no prejudicial error and affirm the judgment.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In August 1995, Susan Henderson was driving on State Route 87 in Arizona when a blue and white Monte Carlo passed her at a high speed. Shortly afterward, she saw a trooper had pulled over the Monte Carlo and was standing next to the driver's door. A few minutes later, the Monte Carlo passed her again, going faster than before. When Henderson approached a construction zone, she saw the Monte Carlo run a red light. She saw defendant in the driver's seat and thought he looked fidgety. Because she was concerned about what may have happened, Henderson wrote down the Monte Carlo's license plate number.

Andrew Vaughan also saw the Monte Carlo on the same stretch of State Route 87 around the same time. The driver, who was the only person Vaughan saw in the car, was speeding and driving erratically. He also wrote down the car's license plate number.

Jared Reynolds was driving on State Route 87 about 40 miles north of Phoenix around 12:30 p.m. on the same day and saw a trooper's patrol car parked with its lights on and a trooper lying down in the road. Reynolds stopped and ran toward the trooper. The trooper, Martin, had been shot but had a faint pulse.

Martin had four gunshot wounds and later died from the injuries. His service weapon was missing, but two magazines remained on his belt.

Around 4:00 p.m. on the same day, defendant called his aunt. He told her he was in Blythe (roughly 200 miles from where Martin was found) and asked her to wire him

3

money for gas. Defendant called her and asked for gas money again about two hours later, but she did not send him any.

Around 8:00 p.m., a Blythe police officer responded to a reported shooting at a minimart. When the officer arrived, he saw the store's attendant, Singh, lying on the ground with gunshot wounds and a bloody shirt. The $20 and $10 bills in the register were missing. Singh told the officer that a "youth" who was "Mexican" shot him. Singh later died from his wounds. The bullet that killed him was recovered from his body during his autopsy.

Cynthia Coffey was about 150 yards from the minimart when she heard a gunshot. She claimed to have seen a "Mexican" man exit the store and drive away in a "larger" "greenish" car. She later identified defendant's blue and white Monte Carlo as the vehicle she saw.

Law enforcement searched the minimart later that evening. They did not find any gun shell casings. The next day, however, a minimart employee found a discharged shell casing. An investigator bought a box of the bullets found on Martin's belt to compare them to the discharged shell casing found at the minimart, and found that they were similar.

Law enforcement around the minimart were told to be on the lookout for defendant's Monte Carlo. On the day after the shootings, a police officer in Indio saw defendant's Monte Carlo. Defendant exited the vehicle and ran to a nearby property,

4

which had several structures and trailers. Law enforcement surrounded the area and began searching for defendant.

Later that night, defendant called a friend. Defendant stated that he had shot someone in Blythe at a convenience store because he would not give defendant money. Defendant also said that he shot the man in the chest after he tried to throw a chair at defendant.

During the search, an investigator talked to three people at the scene. One of them, Tommy Acuna, told the investigator, "I have the murder weapon. I found it. The guy threw it on the ground." The investigator found a .38 caliber revolver wrapped in a towel in Acuna's pants. The weapon was later linked to Martin's murder.

Defendant eventually came out of one of the trailers and was taken into custody. Law enforcement found Martin's gun in the trailer, which was loaded with six Hydra-Shok bullets. On the wall of the trailer, someone had written, "Mr. Neto" and "48." Defendant's nickname was "Neto" and he had the number 48 tattooed on his torso.

In Arizona state court, defendant was convicted and sentenced to death for murdering Martin. The Arizona Supreme Court affirmed his sentence. (*State v. Martinez* (2000) 196 Ariz. 451, 466.) Defendant unsuccessfully petitioned for a writ of habeas corpus in federal court. (*Martinez v. Ryan* (9th Cir. 2019) 926 F.3d 1215, 1238; *Martinez v. Shinn* (May 18, 2020) Case No. 19-7627, 140 S. Ct. 2771.)

In 2011, defendant was charged with the first degree murder of Singh (§ 187) with a personal firearm use enhancement (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)) and

robbery, burglary, and prior-murder special circumstance allegations (§ 190.2, subds. (a)(2), (a)(17)(i), (a)(17)(vii)).  The People sought the death penalty.

While in prison awaiting trial, prison guards saw defendant stab his cellmate, Gutierrez, with a shank.  Gutierrez had around 40 lacerations and required at least 100 staples for his wounds.  Defendant had no puncture wounds and suffered minor injuries.

In 2012, the People filed a second amended complaint, which alleged a new count of attempted murder based on defendant's stabbing Gutierrez.

A jury convicted defendant of Singh's murder and found true the three special circumstance allegations and the firearm use allegation.  The jury found defendant not guilty of the attempted murder of Gutierrez and hung on the lesser included offense of attempted voluntary manslaughter.  The trial court declared a mistrial as to that charge, and the prosecution dismissed it.  The trial court sentenced defendant to life in prison without the possibility of parole for Singh's murder, plus ten years for the firearm enhancement.

III.

DISCUSSION

On appeal, defendant argues the trial court prejudicially erred by:  (1) declining to sever the murder and attempted murder charges; (2) failing to "sanitize" evidence about Martin's murder admitted at trial; (3) failing to bifurcate the prior-murder special circumstance phase from the guilt phase; (4) admitting the testimony from the Arizona trial of ballistics expert Phillip Pelzel, who died before the California trial, while

6

excluding evidence that he died from alcoholism-related complications; (5) denying his mistrial motion; and (6) admitting evidence about "Mr. Neto" and "48" being found written on the trailer wall. Defendant also contends cumulative error requires reversal and the trial court erroneously imposed a parole revocation fine.

A. *Severance*

Defendant contends the trial court improperly denied his repeated motions to sever the murder charge from the attempted murder charge. We disagree.

Under section 954, two charges in "the same class of crimes or offenses" may be tried jointly. (*People v. Jones* (2013) 57 Cal.4th 899, 925.) As defendant acknowledges, murder and attempted murder are in the same class of crimes. When, as here, section 954's requirements for joinder are satisfied, defendant "'"can predicate error in denying the motion [to sever] only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion."' [Citation.]" (*Ibid.*) We will reverse the judgment "'only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt."' [Citations.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 597.)

Although defendant was convicted of the murder charge, he was acquitted of attempted murder, and the jury hung on the lesser included offense of voluntary manslaughter. This shows that "the jury clearly considered and weighed the evidence carefully as to each charge separately" because the acquittal "demonstrate[s] a careful sifting of the evidence and a properly cautious verdict." (*People v. Moore* (1986) 185

7

Cal.App.3d 1005, 1013.)  When, as here, the jury convicts the defendant of one offense, but acquits on a joined offense, "we are confident the jury was capable of, and did, differentiate among defendant's crimes."  (*People v. Jones*, *supra*, 57 Cal.4th at p. 927; see *People v. Simon* (2016) 1 Cal.5th 98, 130 ["[T]he fact that the jury found Simon guilty of first degree murder in the killings of Anes and Magpali, but only second degree murder of Sterling, 'strongly suggests that the jury was capable of weighing the evidence and differentiating among [the] various charges.'"].)  We therefore conclude defendant has failed to make a clear showing of potential prejudice arising from the trial court's refusal to sever the attempted murder charge from the murder charge.  The trial court did not abuse its discretion in denying his motion to sever.

B.  *Evidence from Trial of Martin's Murder*

1.  *Background*

Before trial, the parties and the trial court discussed whether the prosecution intended to introduce evidence of Martin's murder.  The prosecutor confirmed that he intended to do so.  Defendant asked the trial court to "conduct a balancing under [Evidence Code section] 352," arguing that the admission of evidence about Martin's murder was unduly prejudicial.  The trial court disagreed, finding that the evidence was more probative than prejudicial under Evidence Code section 352.

During the trial, the prosecution introduced much of the evidence admitted in defendant's Arizona trial for Martin's murder, which included exhibits, physical evidence, and the testimony of percipient witnesses, expert witnesses, law enforcement,

8

and defendant's friends and relatives.  Defendant argues the trial court prejudicially erred by not "sanitizing" the evidence by excluding at least some of the more prejudicial evidence related to Martin's murder.  We disagree.

"Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  Because the decision to admit or exclude evidence under Evidence Code section 352 is committed to the trial court's discretion, we will not disturb a trial court's exercise of that discretion """"except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."""" (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000-1001.)

Defendant acknowledges that "*some* facts related to the Arizona crime [were] probative of identity," but argues "it was not necessary to admit *all* of the facts when many were extraneous or too prejudicial to overlook."  Yet defendant does not identify which facts were "extraneous" or "too prejudicial" in his opening brief.[2]  Defendant

---

[2]  Defendant argues for the first time in his reply brief that the trial court erroneously admitted eight photographs of Martin's body after the shooting.  Because defendant did not raise this evidentiary challenge in his opening brief, we do not consider it.  (*Charney v. Standard General, L.P.* (2017) 10 Cal.App.5th 149, 154 fn. 6 [declining to address undeveloped argument that trial court made several evidentiary errors because it "lack[ed] specificity"]; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 ["[I]t is counsel's duty to point out portions of the record that support the position taken on appeal" because "[t]he appellate court is not required to search the record on its own

*[footnote continued on next page]*

9

similarly argues the trial court "erred when it refused to exclude some evidence about the Arizona murder or to sanitize the more inflammatory parts of the offense," but does not enumerate which facts the trial court improperly admitted or failed to "sanitize."

To the extent defendant argues the trial court improperly admitted *any* evidence of Martin's murder, we disagree. Some of the evidence was clearly admissible. That defendant shot and killed Martin and stole his gun, which was forensically linked to Singh's murder, was highly relevant to establishing his identity as Singh's murderer. It was also relevant to show why defendant shot Singh and robbed a minimart nearly 100 miles from where he was arrested the next day—to get gas money to continue his flight from the Arizona crime scene. In these ways, the evidence of Martin's murder was highly relevant to establishing defendant's identity, motive, and intent as related to Singh's murder.[3] Although that evidence was prejudicial in that it implicated defendant as Martin's murderer, the trial court reasonably concluded it was not unduly prejudicial given that it was highly probative. The trial court therefore did not exercise its discretion under Evidence Code section 352 """"in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."""" (*Uspenskaya v. Meline*, *supra*, 241 Cal.App.4th at pp.1000-1001.)

---

seeking error"]; *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [argument raised for the first time in the reply brief waived].)

[3] Although the trial court only explicitly found the evidence was related to identity, we affirm the trial court's evidentiary ruling if it "was correct on any ground." (*People v. Geier* (2007) 41 Cal.4th 555, 582, overruled on other grounds as stated in *People v. Houston* (2012) 54 Cal.4th 1186, 1220.)

Even if the trial court erred in admitting evidence of Martin's murder, the error was harmless. It is not reasonably probable that defendant would have obtained a better result had the evidence been excluded. Defendant was not convicted of any charge related to Gutierrez, and the evidence of his guilt for Singh's murder was strong.

First, defendant was found hiding in the trailer where Martin's gun was found. No one else was inside the trailer at the time. Second, Martin's gun was forensically linked to Singh's murder by a ballistics expert. Third, an eyewitness, Coffey,, identified defendant's vehicle as the one she saw fleeing from the minimart after she heard a gunshot coming from inside the minimart. Fourth, a witness testified that after Singh's murder defendant stated that he had shot someone in a convenience store in Blythe because he would not give defendant the money in the register.

Given this evidence that defendant murdered Singh, it is not reasonably probable that he would have received a more favorable outcome had the trial court excluded evidence that defendant murdered Martin. The trial court's error in admitting that evidence, if any, was therefore harmless.

C. *Bifurcation of the Prior-Murder Special Circumstance*

Defendant was charged with, among other things, a prior-murder special circumstance allegation for Martin's murder (§ 190.2, subd. (a)(2)), which the jury found true, making defendant eligible for a death sentence (§ 190.1). When discussing jury instructions with the parties in the middle of the trial, defendant asked the trial court to bifurcate the trial on the prior-murder special circumstance from the trial on his guilt for

11

Singh's murder.  The trial court denied the request because defendant did not move to bifurcate the proceedings earlier, which suggested that defendant waived the argument or did not raise the issue earlier "for a tactical reason."  The trial court also found that bifurcation was unnecessary because the jury would hear evidence about Martin's murder given that it was relevant to Singh's murder.

Defendant argues the trial court erred by failing to bifurcate the trial on the prior-murder special circumstance allegation from the trial proceedings on his guilt for Singh's murder.  He thus argues the prior-murder special circumstance true finding must be reversed.  We agree the trial court erred in not bifurcating the proceedings, but conclude the error was harmless.

When interpreting a statute, "[o]ur fundamental job is to ascertain the intent of the lawmakers in order to effect the statute's purpose.  [Citations.]  We look first to the actual language of the statute.  'If the terms are unambiguous, we conclude the lawmakers meant what they said and the plain meaning of the language prevails.'  [Citation.]" (*In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945, 957.)

Generally, "[w]henever special circumstances . . . are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance." (§ 190.4, subd. (a).)  But "a prior-murder special circumstance allegation (§ 190.2, subd. (a)(2)) . . . *requires* a separate proceeding." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 171, italics added.)  This is because "evidence of [a prior murder] conviction may potentially have an

inflammatory effect on jurors who are asked to determine a defendant's guilt or innocence on a current charge of murder." (*People v. Farnam* (2002) 28 Cal.4th 107, 146.)

Section 190.1, subdivision (a) provides in relevant part: "If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in [s]ection 190.2 *except for* a special circumstance charged pursuant to paragraph (2) of subdivision (a) of [s]ection 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree." (Italics added.) In that case, "the truth of that allegation *shall* be determined in a separate proceeding following a finding of first degree murder by the trier of fact." (*People v. Hinton* (2006) 37 Cal.4th 839, 873, italics added.)

Section 190.2, subdivision (a)(2) thus contemplates that the proceedings on a prior-murder special circumstance *must* be bifurcated from the proceedings on the charged murder offense because the evidence of the prior murder may be inflammatory. The trial court here, however, declined to bifurcate the proceedings mainly because it found that evidence of Martin's murder was relevant to defendant's guilt for Singh's murder and so the jury was "going to hear about [the evidence] anyway."

Without citing any supporting authority, the People suggest that bifurcation of the proceedings on a prior-murder special circumstance is unnecessary if evidence related to the special circumstance is admissible in the trial on the defendant's guilt for the charged

13

offense.  But "section 190.1[, subd[ivision] (b)], makes clear that a trial court may not force a capital defendant to undergo a unitary trial of the separate issues of the defendant's guilt of first degree murder and the truth of a prior murder conviction special-circumstance allegation." (*People v. Farnam*, *supra*, 28 Cal.4th at p. 141.)  So when "a prior-murder special circumstance is alleged, there *shall be* separate 'further proceedings' to determine *the truth of* that special circumstance allegation." (*Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1299, italics added, original italics.)  We therefore conclude the trial court erred in denying defendant's request to bifurcate the trial on the prior-murder special circumstance from the trial on defendant's guilt for Singh's murder.

We agree with the parties that we review the error under California's harmless error rule announced in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (See *People v. Hinton*, *supra*, 37 Cal.4th at p. 874 ["[T]he right to a separate proceeding is merely statutory, not constitutional"]; *People v. Epps* (2001) 25 Cal.4th 19, 29 [violation of statutory right is reviewed under *Watson*].)  Under that standard, defendant must show it is reasonably probable that he would have received a more favorable outcome absent the error.  (*Ibid*.)

Defendant argues the jury's true finding on the prior-murder special circumstance must be reversed, yet he provides no argument in his opening brief as to how he was prejudiced by the trial court's refusal to bifurcate the proceedings.  "It is an appellant's duty to spell out in the briefing exactly how a claimed error caused prejudice; put another way, we do not presume prejudice." (*People v. Reardon* (2018) 26 Cal.App.5th 727,

14

740.) Defendant's "failure to explain with particularity how" the trial court's failure to bifurcate the proceedings "caused prejudice forfeits the claim." (*Ibid*.)

In any event, we conclude the trial court's error was harmless. The way in which bifurcation could benefit a defendant is by keeping evidence of the prior murder out of the current murder trial. In this case, however, at least some evidence of the Arizona murder would have been admitted in connection with the murder charge even if the special circumstance were not at issue. As discussed earlier, defendant concedes that evidence relevant to provide his identity as Singh's murderer was admissible, and such evidence includes the fact that defendant shot and killed Martin and stole the gun apparently used to kill Singh. As well, as also discussed, facts establishing defendant's motive for the robbery of the minimart likely would have been admitted; that is, defendant's need for gas money to continue his flight from the Arizona crime. Once some significant evidence of the Arizona murder was admissible, however, we do not have reason to conclude that defendant would have obtained a more favorable result on the murder charge had the trial court excluded some evidence of Martin's murder from that phase due to bifurcated proceedings.

It is also not reasonably probable the jury would have found the prior-murder special circumstance not true had the proceedings on the prior-murder special circumstance allegation been bifurcated from the guilt phase for Singh's murder. There is no reason to conclude that any different evidence would be before the jury in the bifurcated special circumstance stage as it had before it at this unbifurcated trial. As

15

well, defendant was convicted of first degree murder for killing Martin, and his conviction was upheld by the Arizona Supreme Court and the federal courts. (See *State v. Martinez*, *supra*, 196 Ariz. 451; *Martinez v. Shinn*, Case No. 19-7627.) Because the fact of defendant's conviction for Martin's murder was not subject to reasonable dispute, it is not reasonably probable that the jury would have found the prior-murder special circumstance allegation not true if the proceedings had been bifurcated. Thus, the trial court's failure to bifurcate the proceedings was harmless.

D. *Pelzel*

Defendant argues the trial court erred in admitting a transcript of the testimony of ballistics expert Pelzel from defendant's Arizona trial because (1) Pelzel's testimony was inadmissible; (2) his testimony was cumulative and duplicative of his colleague's testimony; and (3) evidence of his alcoholism was admissible to impeach his testimony.

1. *Additional Background*

Pelzel conducted ballistics testing in 1997 during the investigation into Martin's murder. He testified and was cross-examined by defendant during the Arizona trial. Pelzel explained that he was given an expended bullet, an expended shell casing, and a handgun. The handgun was Martin's weapon, which Pelzel did not know. Pelzel was asked to determine whether the bullet had been fired from the handgun, whether the bullet matched the ammunition found in the handgun, and whether the expended shell casing matched the casing of the ammunition found in the handgun. Pelzel testified that the expended bullet had "probably" been fired from handgun. The prosecution in the

16

Arizona case thus used Pelzel's testimony to link the bullet found in Singh's body and the shell casing found in the Blythe minimart to Martin's gun, which was found in the trailer where defendant was apprehended.

Pelzel died in 2013. His death certificate listed his cause of death as "chronic ethanolism" with an onset of "years."

Before allowing the prosecution to read Pelzel's Arizona trial testimony into the record, the trial court allowed Pelzel's colleague, Michele Nichols, to testify about Pelzel's investigation. Nichols testified that she agreed with all of Pelzel's findings and conclusions. She also testified that, based on her review of the evidence—including Pelzel's work product—the shell casing found in the minimart came from Martin's gun and the bullet found in Singh's body could have been fired from the gun.

2. *Applicable Law and Standard of Review*

Evidence Code section 1291, subdivision (a)(2), allows the use at trial of former testimony of a declarant "unavailable as a witness," provided "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." "Both the United States Supreme Court and [the California Supreme Court] have concluded that 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question

17

the accuracy or the completeness of the earlier testimony.'" (*People v. Wilson* (2005) 36 Cal.4th 309, 343.) Thus, when a witness who the defendant cross-examined later becomes unavailable, the witness's testimony may be admitted at a subsequent proceeding so long as the defendant's motives during both proceedings are "'similar.'" (*People v. Samayoa* (1997) 15 Cal.4th 795, 850.) We review the admission of evidence under Evidence Code section 1291, subdivision (a)(2) for an abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 332-333, 337.)

The trial court has broad discretion to admit or exclude expert testimony. (*People v. Stoll* (1989) 49 Cal.3d 1136, 1159, fn. 20.) The trial court likewise has broad discretion in determining whether evidence is cumulative (*McGee v. Cessna Aircraft Co.* (1983) 139 Cal.App.3d 179, 192) and whether to admit cumulative evidence. (Evid. Code, § 352; *Bates v. Newman* (1953) 121 Cal.App.2d 800, 807.) We therefore will not disturb the trial court's ruling admitting or excluding expert testimony absent "'a clear showing of an abuse of discretion, i.e., that the court exceeded the bounds of reason.'" (*People v. Dean* (2009) 174 Cal.App.4th 186, 193.) When a trial court erroneously admits cumulative evidence, the appellant bears the burden of showing it is reasonably probable that its admission was prejudicial. (*People v. Williams* (2009) 170 Cal.App.4th 587, 612.)

### 3. *Analysis*

Defendant contends Pelzel's testimony from the Arizona trial was inadmissible under Evidence Code section 1291, subdivision (a)(2) because his motivation in cross-examining Pelzel during that trial differed from his motivations during the California trial in that evidence that defendant killed Singh with Martin's weapon was not introduced in the Arizona trial. Thus, defendant argues Pelzel's testimony related only to a "gun [that] had discharged in an armed robbery, not a murder."

We conclude the trial court did not abuse its discretion by admitting Pelzel's testimony under Evidence Code section 1291, subdivision (a)(2). (*People v. Harris*, *supra*, 37 Cal.4th at p. 337.) In both the Arizona and California trials, defendant was charged with capital murder and faced the death penalty. In both proceedings, the prosecution sought to connect defendant to Martin's gun through Pelzel's testimony. The trial court therefore reasonably found that defendant had a similar motivation in both proceedings: to discredit Pelzel. As a result, Pelzel's testimony was admissible under Evidence Code section 1291, subdivision (a)(2). (See *People v. Samayoa*, *supra*, 15 Cal.4th at p. 850.)

The trial court likewise properly exercised its discretion by denying defendant's request to admit evidence of Pelzel's alcoholism. As the trial court correctly observed, Pelzel conducted his investigation in 1997 and died in 2013, and there was "absolutely no evidence" that his work or testimony had been affected by his apparent alcohol issues. And as defendant acknowledged, evidence of Pelzel's alcohol abuse would require the

19

jury to speculate that he "was drinking back in 1997."  The trial court therefore reasonably concluded that introducing evidence about Pelzel's death and apparent alcoholism would have required the jury to speculate.  We therefore conclude the trial court did not abuse its discretion by precluding defendant  from introducing evidence of Pelzel's alcoholism.  (See Evid. Code, § 350 [only relevant evidence is admissible]; *People v. Morrison* (2004) 34 Cal.4th 698 ["Evidence is irrelevant . . . if it leads only to speculative inferences."].)

Finally, defendant contends the trial court erroneously admitted Pelzel's testimony because it was cumulative of Nichols's testimony, which the People do not seriously dispute.  But even if the trial court had excluded Pelzel's testimony, as defendant requested, the jury still would have heard about it because Nichols's testimony was based largely on her review of Pelzel's notes and investigation.  Nichols testified that she analyzed Pelzel's work and agreed with his findings and conclusions, and explained why.  She also testified that, based on her review of the evidence—including Pelzel's work product—the shell casing found in the minimart came from Martin's gun and the bullet found in Singh's body could have been fired from the gun.  So even if Pelzel's testimony had been excluded, the jury still would have heard about his analysis and conclusions through Nichols's testimony—which defendant does not dispute was properly admitted.  Even if the admission of Pelzel's testimony was erroneous, it would be harmless.  (See *People v. Byron* (2009) 170 Cal.App.4th 657, 676 [assuming defendant's incriminating statements to law enforcement were improperly admitted and concluding their admission

20

was harmless because they were "merely cumulative" to other properly admitted evidence].)

E. *Mistrial Motion*

Defendant contends the trial court erroneously denied his motion for a mistrial based on the prosecutor's alleged misconduct. We disagree.

1. *Background*

Before the trial, the prosecutor told the trial court that he would not introduce any gang-related evidence during the guilt phase. Later, the prosecutor stated that he might introduce evidence of defendant's gang status, but he ultimately did not introduce any gang-related evidence in his case-in-chief.

Gutierrez, the victim of defendant's stabbing in the attempted murder charge, testified for the defense. The prosecutor questioned him extensively about his relationship with defendant, their gang affiliations, and jail politics generally. Gutierrez stated that he wanted to be cellmates with defendant and that they were cellmates for only a few days before the stabbing. He explained that, on the day of his stabbing, he learned he had received a life sentence instead of a death sentence, which "jacked [him] up." He was also upset about his son joining a gang and his father being a "douchebag." Gutierrez was holding in his emotions when he "just let it out" and attacked defendant while feeling an "extreme surge of adrenaline."

Gutierrez later explained that he had to work his way up to becoming a "shot caller" in the jail and that there is "always" someone in the jail trying to take his position.

21

Gutierrez denied that defendant stabbed him because his time was up as a shot caller and stated that he was not concerned about no longer being a shot caller. When asked whether attacking defendant would jeopardize his status as a "shot caller," Gutierrez said that it would, "[b]ecause we weren't allow[ed] to just hurt people like that."

The prosecutor continued to question Gutierrez about jail politics, whether there are rules inmates must follow, and how inmates value, earn, and lose respect. Gutierrez explained that he knew jailhouse rules among Sureños, a Hispanic gang, because he had "an instrumental role" in enforcing them. But when the prosecutor asked a few follow up questions about the rules, Gutierrez denied that he enforced them. The prosecutor then began to ask, "You have never once ever enforced any of the rules of the Mexican Mafia with members in--," but defendant objected. The trial court sustained the objection and ordered a recess.

Outside the presence of the jury, defendant moved for a mistrial. The trial court ruled that the prosecutor's questioning Gutierrez about jailhouse gangs and politics did not justify a mistrial. The trial court told the parties that it would admonish the jury that "questions are not evidence."

When the jury returned, the trial court stated, "Just so the jury knows, questions from either side are not evidence. I think I mentioned that in the very beginning of the trial. So just because someone asked a question is meaningless. Only the witnesses' answers are the evidence. Thank you."

22

2. *Applicable Law and Standard of Review*

"""""When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated."""" (*People v. Shazier* (2014) 60 Cal.4th 109, 127.) A prosecutor's misconduct violates California law if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Tully* (2012) 54 Cal.4th 952, 1009-1010.) Thus, "[a] prosecutor commits misconduct by intentionally eliciting inadmissible testimony." (*People v. Abel* (2012) 53 Cal.4th 891, 925.)

We review de novo a defendant's claim of prosecutorial misconduct. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) We presume, absent evidence to the contrary, that the jury understands and follows instructions from the trial court. (*People v. Fauber* (1992) 2 Cal.4th 792, 823.) We also presume that jurors treat the court's instructions as statements of law, and the arguments of the prosecutor as words spoken by an advocate to persuade. (*People v. Thornton* (2007) 41 Cal.4th 391, 441.) Prosecutorial misconduct that violates state law warrants reversal only when it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the untoward conduct.

23

(*People v. Milner* (1988) 45 Cal.3d 227, 245; see *People v. Crew* (2003) 31 Cal.4th 822, 839.)

"In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. [Citation.] 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]'" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) The trial court "should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

3. *Analysis*

We conclude the trial court did not abuse its "considerable discretion" in denying defendant's motion for a mistrial based on the prosecutor's alleged misconduct. (*People v. Wallace*, *supra*, 44 Cal.4th at p. 1068.) As the prosecutor argued, Gutierrez's trial testimony conflicted with other evidence. Several prison guards testified that they saw defendant stabbing Gutierrez. Gutierrez wrote letters after the incident that conflicted with his trial testimony. In one letter, Gutierrez wrote that defendant "[g]ot me while I was doing pushups. And by the time I was able to fight my way up, I was slippin[g] all over blood, dazed, confused." In another, Gutierrez said that "this fool [defendant] totally did a bitch move on me," and that he remembered "doing pushups with him standing on my shoulders" until he "felt a light slapping" and "started feeling wet behind

my neck and getting dizzy." Gutierrez, however, refused to talk to law enforcement after the incident and testified that he attacked defendant because he was upset about personal issues. The prosecutor thus reasonably questioned Gutierrez about his and defendant's involvement in prison gangs to probe whether and why Gutierrez would have tried to stab—and presumably kill—defendant for no apparent reason after being cellmates for only a few days.

The trial court in turn reasonably found the prosecutor's questions were relevant to eliciting information from Gutierrez that could cast doubt on his story and his purported reasons for attacking defendant. As a result, the trial court did not abuse its discretion by finding that the prosecutor's cross-examination of Gutierrez sought to elicit information about the prison's rules, Gutierrez's status, and his relationship with defendant, which the prosecutor could use to argue that Gutierrez was not credible. In other words, the trial court reasonably found that the prosecutor's cross-examination sought to elicit relevant, admissible testimony from Gutierrez. The prosecutor's cross-examination of Gutierrez did not "irreparably damage" defendant's "chances of receiving a fair trial." (*People v. Bolden*, *supra*, 29 Cal.4th at p. 555.)

The trial court also reasonably found that any impropriety from the prosecutor's questions could be cured by admonishing the jury that the prosecutor's questions were not evidence. (See *People v. Avila* (2006) 38 Cal.4th 491, 574 ["We presume the jury followed the court's instructions."].) It is only in the "exceptional case" that the trial court's admonitions cannot cure the alleged prejudice underlying a defendant's mistrial

25

motion. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 955.) This is not an exceptional case. The trial court therefore did not abuse its discretion in denying defendant's mistrial motion.

E. *"Mr. Neto" and "48" on the Trailer Walls*

The day after Singh's murder, defendant was found hiding in a trailer. After he exited the trailer and was apprehended, law enforcement searched the trailer. They found Martin's gun and "gang-style" graffiti writing on the wall that said "Mr. Neto" and "48." The prosecutor moved to admit photographs of the writing on the trailer wall to prove that defendant fled to the trailer, was familiar with it, and hid Martin's gun in it. The prosecutor explained that "Neto" was defendant's moniker and he has "48" tattooed on his stomach, and thus the writing was relevant to prove defendant possessed Martin's gun. Over defendant's objections, the trial court allowed the prosecutor to introduce photographs of the writing.

The trial court did not abuse its discretion in doing so. The photographs were probative because they suggested defendant was familiar with the trailer where Martin's weapon was found hidden given that the jury could reasonably find that defendant wrote his nickname and a number of some significance to him on the trailer's wall. The photographs were not unduly prejudicial because there was no evidence or argument about the significance of "48" or that "Neto" was defendant's gang moniker. The trial court thus permissibly found that the photographs were more probative than prejudicial under Evidence Code section 352.

26

Even if the trial court erred in admitting the photographs, the error was harmless. "[R]eversal is required only if it is reasonably probable the defendant would have obtained a more favorable result had [the photographs] been excluded." (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 103.) Given the strength of the evidence of defendant's guilt explained above, it is not reasonably probable that defendant would have obtained a better result had the trial court excluded the photographs. As a result, the admission of the photographs, even if erroneous, was harmless.

F. *Cumulative Error*

Defendant argues that he is entitled to reversal because of cumulative error. "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have found only a single, nonprejudicial error in the trial court's refusal to bifurcate the proceedings. We have also assumed for the sake of argument that the trial court erroneously admitted Pelzel's testimony, but conclude the error was harmless given the strong evidence of defendant's guilt. The actual and assumed errors were individually harmless, and "were no more prejudicial together." (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1217.) Even considering the errors in the aggregate, defendant was not deprived of a fair trial or denied due process. "Lengthy criminal trials are rarely

perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Defendant has not made such a showing. As a result, we reject defendant's claim of cumulative error.

F. *Parole Revocation Fine*

The trial court sentenced defendant to life without the possibility of parole for the murder charge and a determinate 10-year sentence for the firearm enhancement, which included a period of parole. The trial court imposed a $10,000 parole revocation fine under section 1202.45.[4] Defendant contends the trial court erred in doing so because he is not eligible for parole given that he was sentenced to life without the possibility of parole. We disagree.

Defendant was sentenced to a determinate 10-year term for the firearm enhancement. This is a determinate prison term under section 1170; all determinate terms "'shall include a period of parole'" under section 3000. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*).)

In *Brasure*, *supra*, 42 Cal.4th 1037, our Supreme Court held a section 1202.45 parole revocation fine was proper when the defendant was sentenced to death and a determinate term. (*Id*. at p. 1075.) A year later, in *People v. McWhorter* (2009) 47

---

[4] Section 1202.45 provides: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of [s]ection 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of [s]ection 1202.4. This additional parole revocation restitution fine shall . . . be suspended unless the person's parole is revoked.

Cal.4th 318, 380 , the Supreme Court struck a parole revocation fine for a defendant who was sentenced to both death and a determinate term.

Our Supreme Court recently reconciled *Brasure* and *McWhorter* in favor of *Brasure*.  (See *People v. Baker* (2021) 10 Cal.5th 1044, 1108.)  The court explained that when, as here, the defendant is sentenced to death and a determinate term, a parole revocation fine for the determinate term is appropriate.  (*Ibid*.)  Because defendant was sentenced to a determinate 10-year term for the firearm enhancement, the trial court properly imposed a $10,000 parole revocation fine.  (*Ibid*.)  In any event, "[d]efendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked."  (*Brasure*, *supra*, 42 Cal.4th at p. 1075.)

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:

CODRINGTON _____
J.

SLOUGH _____
J.

29